976 F.2d 1462
 MARYLAND DEPARTMENT OF HUMAN RESOURCES; Ruth W. Massinga,
Secretary; Linda Walter, Individually and on
behalf of all others similarly situated,
Plaintiffs-Appellees,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE; John R. Block,
Secretary, Defendants-Appellants.
MARYLAND DEPARTMENT OF HUMAN RESOURCES; Ruth W. Massinga,
Secretary; Melinda Y. Harps, Individually and on
behalf of all others similarly situated,
Plaintiffs-Appellees,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE; John R. Block,
Secretary, Defendants-Appellants.
 Nos. 85-2043, 91-2370.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 7, 1992.
Decided Sept. 15, 1992.
As Amended Oct. 27, 1992.
 
 Irene Marietta Solet, Civil Div., U.S. Dept. of Justice, Washington, D.C., argued (Stuart M. Gerson, Asst. Atty. Gen., Michael Jay Singer, Civil Div., U.S. Dept. of Justice, Washington, D.C., Richard D. Bennett, U.S. Atty., Baltimore, Md., on brief), for defendants-appellants.
 Nancy Backer Shuger, Asst. Atty. Gen., Baltimore, Md., argued (J. Joseph Curran, Jr., Atty. Gen. of Maryland, Stuart R. Cohen, Legal Aid Bureau, Inc., Baltimore, Md., on brief), for plaintiffs-appellees.
 Before HALL and LUTTIG, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 The United States Department of Agriculture (USDA) refused to approve two requests by the state of Maryland to exclude certain "energy assistance" grants from its residents' income when calculating eligibility and benefits under the federal food stamp program. The Maryland Department of Human Resources, Maryland's Secretary of Human Resources, and a class of Maryland food stamp recipients sued to require USDA to approve the exclusion requests. The United States District Court for the District of Maryland awarded the plaintiffs summary judgment and granted injunctive and declaratory relief in their favor. USDA appeals the district court's order. We reverse the district court's judgment on the merits and vacate its preliminary injunction.
 
 I.
 
 2
 Most of the relevant facts are detailed in two published opinions by the district court. Maryland Dep't of Human Resources v. USDA, 772 F.Supp. 1562 (D.Md.1991); Maryland Dep't of Human Resources v. USDA, 617 F.Supp. 408 (D.Md.1985). We summarize the facts below only to the extent necessary for the disposition of this appeal.
 
 A.
 
 3
 Plaintiff-appellee Maryland Department of Human Resources administers in Maryland the federal food stamp program established by the Food Stamp Act of 1977, 7 U.S.C. §§ 2011-2032. Pursuant to this program, food stamps are distributed to the plaintiffs-appellees food stamp recipients, among others. Defendant-appellant USDA administers the food stamp program nationwide.[1] Under the food stamp program, each state distributes federally issued stamps to eligible households, see id. §§ 2013-16, which in turn redeem the stamps for food items, see id. §§ 2013(a), 2017, 2018. The federal government pays all benefits for program recipients, see id. § 2013(a), and reimburses fifty percent of each state's administrative costs, see id. § 2025(a).
 
 
 4
 Eligibility for, and benefits under, the federal food stamp program are based on household income--the lower the income, the greater the benefits. See id. §§ 2014, 2017; 7 C.F.R. § 273.10; Shaffer v. Block, 705 F.2d 805, 809 (6th Cir.1983). Income is broadly defined as "all income from whatever source," subject to certain exclusions. 7 U.S.C. § 2014(d); 7 C.F.R. § 273.9(b); see also H.R.Rep. No. 464, 95th Cong., 1st Sess. 25, reprinted in 1977 U.S.Code Cong. & Admin.News 1704, 1971, 2001. One such exclusion is for
 
 
 5
 any payments or allowances made for the purpose of providing energy assistance ... under any State or local laws designated by the State or local legislative body authorizing such payments or allowances as energy assistance, and determined by the Secretary [of USDA] to be calculated as if provided ... on a seasonal basis for an aggregate period not to exceed six months in any year....
 
 
 6
 7 U.S.C. § 2014(d)(11).[2] It is USDA's interpretation of this statutory exclusion from income for state-funded "energy assistance" and, in particular, USDA's refusal to allow Maryland to exclude certain grants from income under this provision that plaintiffs-appellees challenge in this action.
 
 
 7
 Pursuant to its rulemaking authority under the Food Stamp Act, id. § 2013(c), and its mandate to determine whether payments under state or local laws are "for the purpose of providing energy assistance," id. § 2014(d)(11), USDA has promulgated a regulation that outlines "[s]ome indicators," or factors, the presence of which reflects, in USDA's judgment, that the purpose of state or local payments is to provide energy assistance. The enumerated "indicators of purpose" are as follows:
 
 
 8
 (A) The energy assistance is not limited to households which receive [public assistance (PA) ] or [general assistance (GA) ];[3]
 
 
 9
 (B) The energy assistance is provided only to households which actually incur home energy costs;
 
 
 10
 (C) If the energy assistance payments are made separately or combined with other assistance payments, such as PA or GA, the energy assistance results in an increase in total assistance to the household ... when compared to the assistance level as of the first day of the State or local legislative session during which the energy assistance is authorized or increased;
 
 
 11
 (D) The energy assistance is based on studies, surveys, or reports evaluating home energy costs. The energy assistance levels should be directly tied to the findings of such studies, surveys, or reports; and
 
 
 12
 (E) The energy assistance payments are designated as such by the legislative body enacting them....
 
 
 13
 7 C.F.R. § 273.9(c)(11)(i) (footnote added). Although this list is not intended to be "all-inclusive" of the factors that will guide USDA's "case-by-case" review of state requests for energy assistance exclusions, state-funded energy assistance that "meets most of the factors ... will probably be approved for exclusion." Preamble to Final Rule, 48 Fed.Reg. 16,828, 16,828 (Apr. 19, 1983) [hereinafter Final Rule Preamble]. Energy assistance that does not meet most of the factors "probably will not be approved." Id.; see also note 11 infra.
 
 B.
 
 14
 In its 1985 session, Maryland's General Assembly enacted for fiscal year 1986 a $17 million increase in grants to persons receiving Aid to Families with Dependent Children (AFDC) and state-funded General Public Assistance. The legislature denominated this increase as "energy assistance." See 617 F.Supp. at 413-14. On April 17, 1985, Maryland sought USDA's approval to exclude this increase from food stamp income under 7 U.S.C. § 2014(d)(11). See 617 F.Supp. at 411. USDA denied the request, stating that Maryland was required to include the new grant amounts when calculating recipients' income for food stamp purposes. See id.
 
 
 15
 On June 25, 1985, Maryland and a class of food stamp recipients filed an action for declaratory and injunctive relief in the United States District Court for the District of Maryland challenging USDA's interpretation and application of its regulations to require inclusion of the grant amounts in income. See J.A. at 7-23. Despite USDA's denial of Maryland's exclusion request, Maryland began excluding the state-authorized welfare benefit increases from food stamp recipients' income on July 1, 1985, the first day of fiscal year 1986. See 617 F.Supp. at 411. And despite USDA's assurances that it would not impose sanctions pending resolution of the litigation, see id., Maryland sought and obtained on August 2, 1985, a preliminary injunction barring USDA from recouping food stamp overissuances or imposing penalties during the pendency of the litigation, see id. at 416. This injunction appeared to prevent USDA from recouping food stamp overissuances in Maryland or enforcing statutory sanctions against the state even if USDA were to prevail on the merits:
 
 
 16
 1. Defendants may not, now or in the future, impose any fiscal sanctions or other penalties upon the State plaintiffs, or otherwise reduce any funds for administrative costs which normally would be paid to the State plaintiffs in the usual course of defendants' financial participation in Maryland's Food Stamp Program ... from the period beginning August 1, 1985[,] until this matter is determined on the merits.
 
 
 17
 2. Defendants may not, now or in the future, require the State plaintiffs to establish and recover as overissuances the dollar value of any food stamps issued as a result of the State plaintiffs' policy to exclude from income when determining [food stamp] eligibility and benefit level ... the energy assistance grant [for fiscal year 1986] from the period beginning August 1, 1985, until this matter is determined on the merits[.]
 
 
 18
 Id. (emphases added). And in its subsequent order of October 23, 1985, the district court clarified that its injunction in fact would prohibit USDA from ever recouping overissuances made during the pendency of this action or enforcing sanctions in response to the overissuances:
 
 
 19
 [T]he parties dispute whether defendants are entitled to retroactive relief if they prevail on the merits of this action. The court hereby makes clear that its August 2, 1985, order issued in the context of a preliminary injunction bars the defendants from seeking retroactive relief now or in the future regardless of whether it [sic] prevails on the merits....
 
 
 20
 J.A. at 219.
 
 
 21
 Contemporaneous with its decision to bar USDA from recouping overissuances or enforcing sanctions, the district court denied USDA's request that Maryland post an injunction bond pursuant to Fed.R.Civ.P. 65(c). See Hearing Transcript at 77, Maryland Dep't of Human Resources v. USDA, No. HM-85-2734 (D.Md. July 15, 1985) (District Court Docket No. 15) [hereinafter Hearing Transcript]; see also Defendants' Supplemental Memorandum at 19 n. 5, Maryland Dep't of Human Resources v. USDA, No. HM-85-2734 (D.Md. June 26, 1985) (District Court Docket No. 10); Appellants' Br. at 34; Appellees' Br. at 2. The district court accepted Maryland's argument that there was no reason to believe that the state "would not be able to pay any judgment that might ultimately be issued against it." Hearing Transcript at 75, quoted in Appellants' Br. at 34.
 
 
 22
 The court also granted Maryland's motion for partial summary judgment on the questions of standing and the reviewability of USDA's decision. See J.A. at 209-16, 219. The court remanded the case to USDA, however, for additional explanation of the agency's decision to deny Maryland's exclusion request. See id. at 216-20.[4]
 
 
 23
 By letter of December 20, 1985, USDA further explained its denial of Maryland's request. Applying the five "indicators of purpose" in 7 C.F.R. § 273.9(c)(11)(i), USDA agreed that Maryland's grant would "result in an increase in total assistance" to recipient households and that the budget bill had designated the increased funding as energy assistance. J.A. at 223, 225. USDA concluded, however, that Maryland had not satisfied three of the regulatory indicators.
 
 
 24
 First, USDA noted that Maryland's grant increases would benefit only PA and GA recipients and not all food stamp recipients.[5] Second, USDA observed that Maryland had not shown that its grant increases would benefit only those households that have "actual energy costs." Id. at 222. It stated that for the "many households [that] have their energy expenses paid for them by other individuals or other programs which provide funds directly to the landlord or utility provider," Maryland's increase "could not serve as energy assistance because these households are not paying for energy costs." Id. at 222-23. For these households, it noted, an energy assistance exclusion "would be a windfall." Id. at 223.
 
 
 25
 Finally, USDA stated that Maryland had not "directly tied" its grant increases to "studies, surveys, or reports evaluating home energy costs." Id. Data submitted by Maryland, USDA explained, showed "an actual decrease of 3.4 percent in average monthly heating cost per low-income household between 1983 and 1985." Id. USDA pointed out that "Maryland was already allowed an energy assistance exclusion in 1984 even though energy costs had actually decreased." Id. It also noted that the agency specifically had "considered the fact that the only proposed welfare grant increases in Maryland since [fiscal year] 1981 ... were repeated increases in the energy allowance," id., and that after USDA's approval of Maryland's first request for an energy assistance exclusion, "the non-energy assistance portion of" Maryland's welfare "grants stopped increasing," id. at 225. USDA observed that whereas "welfare grants in Maryland for 1986" met only 77.8 percent of recipients' needs, "88.3 percent of the actual costs of home heating" would be met after the proposed grant increases. Id. According to USDA, "[t]hese figures lent credence to the conclusion that" Maryland had "a clear preference ... for increasing energy assistance at a faster rate than other welfare assistance." Id. USDA expressed concern "about manipulation of the energy exclusion allowance provision" and noted that "Maryland's repeated increases in energy assistance with requests for exclusion of those increases ... from food stamp income signals abuse of the energy assistance exclusion." Id. USDA summarized its reasons for rejecting Maryland's exclusion request as follows:
 
 
 26
 [W]hen [a state welfare payment] will not go to all low-income households [but] will go to all PA and GA recipients, even those who have no actual energy costs, and where over a four year period the only PA/GA grant increases have been labeled energy assistance even though available data indicates that ... energy costs for low-income households in the State have actually decreased, the payment appears to be a general welfare increase rather than an energy assistance payment.
 
 
 27
 Id.
 
 
 28
 In its 1986 session, the Maryland General Assembly enacted a $4.1 million "energy assistance" increase in state-funded General Public Assistance grants for fiscal year 1987. See id. at 235-37, 262. On April 15, 1986, Maryland again sought an energy assistance exclusion from USDA. See id. at 235-62. On May 19, 1986, USDA denied the request for essentially the same reasons stated in the December 20, 1985, letter denying the request for fiscal year 1986. See id. at 263-66. As it had done the previous fiscal year, Maryland implemented the proposed exclusion despite USDA's disapproval, see id. at 231, and filed a supplemental complaint covering the proposed exclusion for fiscal year 1986, see id. at 230-69.
 
 
 29
 The case inexplicably lay dormant until 1990, when the district court referred the parties' cross-motions for summary judgment to a magistrate judge. The magistrate judge recommended granting the plaintiffs' motions for summary judgment and denying the defendants' cross-motions. See id. at 276. He based this recommendation on the belief that USDA's denial of Maryland's requests had been premised on two unlawful factors: (1) changes in energy costs in the year for which Maryland had requested each energy assistance exclusion and (2) Maryland's recent history of multiple, successive requests for energy assistance exclusions. See id. at 307-08, 314-17. According to the magistrate judge's review of the legislative history of the Food Stamp Act, Congress intended to create a permanent, long-range program for extending energy assistance to food stamp recipients. See id. at 308-15. He reasoned from this intention that Congress meant to forbid USDA from considering either annual energy costs or the number of exclusion requests by a state in assessing whether a particular grant is for the purpose of energy assistance. See id. at 315-17. The magistrate judge concluded that Maryland had complied with the statutory exclusion for energy assistance by showing (1) that "local energy prices in 1985 and 1986 were well above pre-1980 levels," (2) that "public assistance recipients continued to have a shortfall of funds ... to pay the high energy costs in each year Maryland applied for the exclusion," and (3) that "the Maryland General Assembly[ ] inten[ded] to address this shortfall in a fiscally responsible manner." Id. at 316.
 
 
 30
 The district court thereafter adopted the magistrate judge's report and recommendation. See 772 F.Supp. at 1565. The court agreed with the magistrate judge that USDA had acted contrary to congressional intent in denying Maryland's exclusion requests. See id. at 1563. Like the magistrate judge, the court believed that "the legislative history proved dispositive of the question of congressional intent" in favor of the plaintiffs' interpretation of the statute and that deference to USDA's administrative interpretation of the Food Stamp Act was therefore unwarranted. Id. Finding that USDA had required Maryland "to demonstrate increasing energy costs in the year of application" and limited "the number of times a state may be granted an exclusion" and that reliance on these factors was inconsistent with congressional intent, the court concluded that USDA's rejections of Maryland's exclusion requests were "contrary to law and an abuse of discretion." Id. at 1564.
 
 
 31
 USDA has appealed both the district court's grant of summary judgment against it and the court's preliminary injunction. See note 4 supra.
 
 II.
 
 32
 We begin by reviewing the district court's grant of summary judgment for Maryland and the recipient class, as challenged by USDA in No. 91-2370. We first address whether the Food Stamp Act permitted USDA, in ruling on Maryland's requests for energy assistance exclusions, to consider the absence of an increase in energy costs during the years immediately preceding the requests and the state's record of multiple applications. Contrary to the district court, we conclude that USDA's consideration of these two factors was consistent with the language, legislative history, and purpose of the Food Stamp Act's energy assistance exclusion. We reject as untimely and meritless Maryland's argument that these factors were beyond the scope of USDA's final rule interpreting the exclusion and that USDA's application of these factors therefore violated the requirements for informal rulemaking under the Administrative Procedure Act. Finally, we sustain as not arbitrary or capricious USDA's findings as to Maryland's failure to satisfy three of the "indicators of purpose" under USDA's energy assistance rule. Accordingly, we reverse the grant of summary judgment against USDA and order entry of summary judgment in favor of USDA.
 
 A.
 
 33
 Because Maryland has challenged USDA's interpretation of the energy assistance provision of the Food Stamp Act, we must decide whether that administrative interpretation is valid under the two-step analysis of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44 & nn. 9, 11, 104 S.Ct. 2778, 2782-83 & nn. 9, 11, 81 L.Ed.2d 694 (1984). In this regard, we first must discern "whether Congress has directly spoken to the precise question at issue." Id. at 842, 104 S.Ct. at 2781. "[I]f the statute is silent or ambiguous with respect to the specific issue," we then must determine "whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782; accord, e.g., National R.R. Passenger Corp. v. Boston & Maine Corp., --- U.S. ----, ---- - ----, 112 S.Ct. 1394, 1401-02, 118 L.Ed.2d 52 (1992). The ultimate question if the statute is silent or ambiguous is whether the agency's interpretation is " 'rational and consistent with the statute,' " Sullivan v. Everhart, 494 U.S. 83, 89, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990) (quoting NLRB v. United Food Workers Union, Local 23, 484 U.S. 112, 123, 108 S.Ct. 413, 416, 98 L.Ed.2d 429 (1987)), for we must defer to a reasonable agency interpretation not inconsistent with the statute's plain language, see, e.g., K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291-92, 108 S.Ct. 1811, 1817-18, 100 L.Ed.2d 313 (1988). Deference is especially "appropriate" when a statute such as the Food Stamp Act "has produced a complex and highly technical regulatory program" requiring numerous "policy determinations" within the expertise of the agency. Pauley v. Bethenergy Mines, Inc., --- U.S. ----, ----, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991); see also Mowbray v. Kozlowski, 914 F.2d 593, 598 (4th Cir.1990) ("Judicial deference is especially appropriate in the area of welfare administration....").
 
 
 34
 The district court refused to defer to USDA's interpretation of the energy assistance exclusion under Chevron because, in the court's view, this interpretation was clearly contrary to the congressional intent that could "be gleaned from the text of the statute or from the legislative history." 772 F.Supp. at 1563-65 (citing Chevron, 467 U.S. at 843 n. 9, 861-62, 104 S.Ct. at 2782 n. 9, 2790-91). In so holding, the district court endorsed the magistrate judge's determinations with respect to the legislative history. See id. at 1564-65; J.A. at 308-17. Drawing primarily on legislators' scattered remarks in support of a permanent, long-range program for eliminating the need of low-income households to choose between food and heat during the energy crisis of the late 1970s,[6] the magistrate judge had concluded that "Congress in no way intended for a state to have to demonstrate to [USDA] an annual increase in local home energy prices in order to qualify for [an] exclusion." J.A. at 315-16. The magistrate judge had also concluded that USDA has neither "the discretion [n]or the responsibility" to impose "a limitation on the number of times a state may be granted an exclusion." Id. at 316-17. The district court agreed that "the legislative history ... proved dispositive of the question" of whether Congress intended to forbid consideration of these two factors, declined to defer to USDA, and struck down the agency's interpretation of the Food Stamp Act. 772 F.Supp. at 1563.
 
 
 35
 We disagree with the district court's analysis and reject its holding. We are convinced after review of the Food Stamp Act and its legislative history that the district court erred in holding that USDA's interpretation of the energy assistance exclusion was clearly foreclosed by Congress. The district court and the magistrate judge appear to have conceded that USDA's interpretation is not inconsistent with the actual language of the energy assistance provision. Their analysis, rather, was that the legislative history of the provision precludes the agency's interpretation. We agree that the language of the provision does not foreclose USDA's interpretation. We disagree, however, with the district court's conclusion that the agency's interpretation is inconsistent with the legislative history.
 
 
 36
 When Congress amended the Food Stamp Act in 1980 to exclude from recipients' income "any payments or allowances made under any Federal, State, or local laws for the purpose of providing energy assistance," Pub.L. No. 96-249, § 102, 94 Stat. 357, 357 (1980), it recognized that state and local governments could abuse the new exclusion in order to transfer additional welfare benefits to food stamp recipients at federal expense. Consequently, Congress expressly conditioned income exclusions under this provision upon a showing that USDA was "satisfied that the increase in benefits awarded by the State or local government ... is, in fact, an energy assistance-related increase and not simply a general welfare increase that would have occurred even were energy costs not a factor." H.R.Rep. 788, 96th Cong., 2d Sess. 123, reprinted in 1980 U.S.Code Cong. & Admin.News 843, 956. This condition placed a limit on the availability of the energy assistance exclusion:
 
 
 37
 Only where energy costs are a but-for cause of the increased payment should the payment be excluded from income and, then, only to the extent that the increase is attributable to high heating costs rather than general inflationary conditions. [Congress] obviously expects that State legislatures ... will operate in good faith and not take advantage of this exclusion by labeling every annual or other regular welfare allotment adjustment an energy assistance increase in order to take advantage of this exclusion of food stamp recipients within [their] jurisdiction[s].
 
 
 38
 Id.
 
 
 39
 Congress' expectation of good faith by state authorities proved misplaced. Recognizing that the exclusion created a means for "shifting ... State [welfare] cost[s] to the Federal treasury," some state legislatures exploited the exclusion by "arbitrarily designat[ing] portions of payments that they [were] already making as 'energy assistance' and thereby ha[d] that income excluded for food stamp purposes." S.Rep. 128, 97th Cong., 1st Sess. 33 (1981).[7] To prevent state manipulation of the exclusion, Congress again amended the Food Stamp Act in 1981 to exclude from income "any payments made under ... any State or local laws for the purpose of providing energy assistance, designated ... as energy assistance, and determined by the Secretary to be calculated as if provided by the State ... on a seasonal basis." Pub.L. No. 97-98, § 1306, 95 Stat. 1213, 1283 (1981) (emphasis added).[8] The purpose of this amendment, according to its sponsor, was to close a loophole that [then] permit[ted] States to shift more of the cost of their State welfare programs to the Federal Government via the food stamp program" by "raising welfare payments and calling them energy assistance." 127 Cong.Rec. 24,854 (Oct. 22, 1981) (remarks of Rep. Roukema).[9]
 
 
 40
 Finally, after the denial of the exclusion requests at issue in this case, Congress enacted a 1988 technical amendment to the Food Stamp Act's energy assistance provision. Pub.L. No. 100-435, § 343, 102 Stat. 1647, 1663-64 (1988). The sole purpose of this "technical correction" was to "clarify that USDA and local agencies [did] not need to conduct an inquiry into the purpose of a federal statute," but rather only an inquiry into "the purpose of the payment" under the statute. S.Rep. No. 397, 100th Cong., 2d Sess. 28-29 (1988), reprinted in 1988 U.S.Code Cong. & Admin.News 2239, 2266-67; see also Larry v. Yamauchi, 753 F.Supp. 784, 797 (E.D.Ark.1990); cf. West v. Bowen, 879 F.2d 1122, 1130-31 (3d Cir.1989) (relying on the 1988 amendment in concluding that federal utility rebates should be excluded from income for food stamp purposes). Congress expressly stated that this amendment was "not intended to change current policy" and that "an undifferentiated allotment of money ... which [a] state elects to provide as energy assistance ... would be evaluated under the factors the [Food Stamp] Act sets forth ..., with reference to any of the factors in the [USDA] regulations that apply." S.Rep. No. 397, supra, at 29 (emphasis added), reprinted in 1988 U.S.Code Cong. & Admin.News at 2239, 2267.
 
 
 41
 This history of the energy assistance exclusion convinces us that the district court erred in concluding that Congress "evince[d] an unambiguous ... intention to forbid" consideration of the factors challenged by Maryland. Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 129, 105 S.Ct. 1102, 1109, 84 L.Ed.2d 90 (1985). "Nothing in the legislative history ... suggests that Congress intended the provision to permit states, at the expense of the food stamp program and federal taxpayers, to pay almost the entirety of low-income citizens' heating costs where, prior to the energy crisis, welfare coverage of energy costs" was much lower. Appellants' Br. at 15. To the contrary, the legislative history firmly (if not unambiguously) supports an interpretation of the Food Stamp Act that allows USDA to rely on the challenged factors. Against the historical backdrop of state abuse of the energy assistance exclusion and Congress' insistence that USDA carefully review exclusion requests in order to curb such abuse, it defies reason to conclude, as the district court did, that USDA lacked the authority even to consider the absence of an increase in energy costs in the years immediately preceding a state's exclusion request and any pattern of exclusion requests during such a period of stable or declining costs, when acting upon exclusion requests. The presence or absence of these factors bears directly on (even if it is not dispositive of) the central statutory question of whether the particular grant for which an exclusion is sought is truly intended as energy assistance.
 
 
 42
 Indeed, given the objectives of the exclusion, we find USDA's application of both factors particularly appropriate. Congress understood "[e]nergy assistance payments" as a narrow form of relief, "provided in recognition of the burden placed on low-income households by rapidly increasing residential energy costs." S.Rep. No. 128, supra, at 33 (emphasis added). These payments were intended as "more of a wash transaction than any real increase in the ... benefited households' purchasing power." H.R.Rep. 788, supra, at 122, reprinted in 1980 U.S.Code Cong. & Admin.News at 955. If home energy costs are stable or even declining, then it is reasonable to infer that state welfare grant increases characterized as energy assistance may not in fact be for the purpose of energy assistance, because such payments would clearly do more than "hold low-income households harmless by permitting them to buy the same amount of energy they would have utilized in past years." Id.; cf. 125 Cong.Rec. 32,090 (Nov. 13, 1979) (remarks of Sen. Pell) ("I am offering this amendment which would hold current food stamp beneficiaries harmless...."). Likewise, it is reasonable to infer from a pattern of repeated exclusion requests during periods of stability or decline in annual home energy costs that a state's proposed grant increases are attributable to "general inflationary conditions" rather than to "high heating costs." H.R.Rep. 788, supra, at 123, reprinted in 1980 U.S.Code Cong. & Admin.News at 956. These factors apply with particular force in the context of USDA's denial of Maryland's exclusion request, since increases in Maryland's purported energy assistance grants markedly outstripped increases in the non-energy portion of Maryland's welfare grants during these periods of stable energy costs. See J.A. at 225, 265; see also part II.C.1.infra.
 
 
 43
 The district court, the magistrate judge, and the state of Maryland, see 772 F.Supp. at 1564; J.A. at 315; Appellees' Br. at 11-12, have each asserted that Congress' failure to repeal the exclusion when it amended the energy assistance provision in 1988 during a period of stable energy costs undermines USDA's interpretation of the statute. We disagree. That Congress continued to "believe[ ] [that] the cost of home energy remained a burden to many poor Americans" despite the stabilizing market, 772 F.Supp. at 1564; see also J.A. at 315, has little, if any, bearing on the specific question of whether USDA may permissibly consider fluctuations in annual energy costs when ruling on exclusion requests. The preservation of the exclusion merely showed that Congress did not intend the "drastic impact on food stamp recipients" that would have attended an immediate revocation of all energy assistance exclusions that USDA had theretofore approved. Appellants' Br. at 30. If anything, the 1988 technical amendment effectively ratified USDA's interpretation of the energy assistance provision. Congress was aware of USDA's pre-1988 interpretation of the statute as codified in the energy assistance rule, see S.Rep. No. 397, supra, at 29, reprinted in 1988 U.S.Code Cong. & Admin.News at 2267, and the amendment's " 'failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress,' " Young v. Community Nutrition Inst., 476 U.S. 974, 983, 106 S.Ct. 2360, 2366, 90 L.Ed.2d 959 (1986) (quoting NLRB v. Bell Aerospace Co., 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974)); see also Appellants' Reply Br. at 15 n. 11.
 
 
 44
 The district court's failure to accord proper deference to USDA's interpretation of the energy assistance provision stemmed from a fundamental misunderstanding of the legislative record. Although the district court purported to rely on the exclusion's legislative history, it either overlooked or misconstrued the most relevant evidence of congressional intent apparent from even a cursory review of that history. By relying on selective, general comments by individual legislators instead of directly relevant and highly specific passages addressing the purpose of the energy assistance exclusion, the court based its decision on a distorted view of the legislative record. Properly read, the legislative history provides ample support for USDA's interpretation of the statute. The tidbits of legislative history seized upon by the district court indisputably reveal that certain legislators hoped generally that Congress would establish a "permanent" energy assistance program. See sources cited in note 6 supra. The purpose of this "permanent" program, however, was to establish a "mechanism for responding to spikes in the price of energy whenever they might occur." Appellants' Br. at 28. Once the exclusion's purpose is properly understood, it becomes apparent that USDA's "year-by-year determinations ... of whether current conditions warrant an exclusion" are entirely consistent with congressional intent. Id.
 
 
 45
 We therefore conclude, contrary to the magistrate judge and the district court, that USDA's interpretation of the Food Stamp Act's energy assistance exclusion so as to permit consideration of trends in annual energy costs and a state's pattern of exclusion requests is not only consistent with, but faithful to, Congress' intent in enacting the exclusion. Although the 1980 and 1981 amendments to the Food Stamp Act were intended to permit states to extend genuine energy assistance to low-income households without reducing food stamp benefits, the legislative record shows that Congress, specifically contemplating the potential for abuse inherent in the extension of federal assistance, empowered and entrusted USDA to deny meritless exclusion requests. USDA's decision to consider annual energy cost fluctuations and the frequency of exclusion requests during periods of stable or even declining energy costs ultimately promotes these legislative purposes of the energy assistance exclusion.
 
 B.
 
 46
 Despite failing to argue before the magistrate judge or the district court that "rulemaking should have been required before USDA could consider the two additional factors [allegedly] not in its regulations," Maryland now asks that this court address "USDA's failure to engage in such rulemaking." Appellees' Br. at 24. Maryland argues that USDA, by considering "the lack of an annual rise in recipients' energy costs" and the state's record of "repeat applications" for an exclusion, exceeded the scope of the agency's final rule on energy assistance, 7 C.F.R. § 273.9(c)(11)(i). Appellees' Br. at 19-20. We reject this argument as not only untimely but also meritless.
 
 
 47
 "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). Nevertheless, Maryland requests that we resolve this issue lest "refusal to address" a plain error "result in a denial of fundamental justice." Bakker v. Grutman, 942 F.2d 236, 242 (4th Cir.1991) (internal quotation marks omitted); see also National Wildlife Fed'n v. Hanson, 859 F.2d 313, 318 (4th Cir.1988) (requiring " 'plain' " error and a "miscarriage of justice" for appellate consideration of an issue not previously raised). In six years of district court litigation over a rule first proposed in 1982, however, Maryland never attacked the rule's procedural sufficiency under the Administrative Procedure Act. See 5 U.S.C. § 553. These are scarcely the "exceptional circumstances" that warrant consideration of a question "not raised and properly preserved in the trial forum." United States v. One 1971 Mercedes-Benz, 542 F.2d 912, 915 (4th Cir.1976).
 
 
 48
 Even if we resolve our doubts over the propriety of entertaining this belated argument in Maryland's favor, we are satisfied that USDA properly regarded these factors as falling within its energy assistance rule. 7 C.F.R. § 273.9(c)(11)(i). USDA first proposed its rule in 1982, after Congress had amended the Food Stamp Act's energy assistance provision in response to abuse by state legislatures. Relying on Congress' statement that " 'the Department [must be] satisfied that [an] increase awarded by [a] State ... is in fact an energy assistance-related increase and not simply a general welfare increase that would have occurred even were energy costs not a factor,' " USDA declared that when "energy assistance payments are commingled with other grant payments, they are excludable only to the extent that the energy assistance is truly energy cost-related." Preamble to Proposed Rule, 47 Fed.Reg. 40,443, 40,444 (Sept. 14, 1982) [hereinafter Proposed Rule Preamble] (quoting H.R.Rep. No. 788, supra, at 123, reprinted in 1980 U.S.Code Cong. & Admin.News at 956). USDA believed that "[t]he legislative record clearly indicates that Congress ... intend[ed] that a 'purpose test' be applied to ensure that the exclusion is provided only for bona fide energy assistance." Id. at 40,445.[10] The purpose test proposed by USDA was the open-ended, five-factor rule codified at 7 C.F.R. § 273.9(c)(11)(i). USDA expressly stated that this list was not "all-inclusive" and that it was "intended simply to provide guidance to State agencies regarding the types of considerations" that might affect USDA's determination "of whether the purpose of a payment or allowance is to help households meet increasing home energy costs." Proposed Rule Preamble, 47 Fed.Reg. at 40,445 (emphasis added). When USDA promulgated the final rule in 1983, it observed that some commenters had "misconstrued [the proposed rule's] guidelines as a set of rigid criteria against which state and local plans would be evaluated." Final Rule Preamble, 48 Fed.Reg. at 16,828. In response, USDA re-emphasized that review of exclusion requests would be conducted "on a case-by-case basis," with a determination of purpose the chief objective. Id.
 
 
 49
 USDA concedes that "the regulations do not refer explicitly to the current stability or volatility of energy costs or to a state's history of previously-approved exclusions." Appellants' Reply Br. at 9. It analyzed these putatively "additional" factors under the fourth "indicator[ ] of purpose" in its final rule--whether proposed energy assistance is "directly tied to the findings" of "studies, surveys, or reports evaluating home energy costs," 7 C.F.R. § 273.9 (c)(11)(i)(D); see J.A. at 223-25, 265-66. USDA has the "unique expertise and policymaking prerogative[ ]" to interpret and apply its own regulations, and we are satisfied to defer to this "reasonable" and "authoritative[ ]" exercise of its interpretative authority. Martin v. Occupational Safety & Health Review Comm'n, --- U.S. ----, ----, 111 S.Ct. 1171, 1176, 113 L.Ed.2d 117 (1991); see also Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359, 109 S.Ct. 1835, 1850, 104 L.Ed.2d 351 (1989); Fairfax Nursing Center, Inc. v. Califano, 590 F.2d 1297, 1301 (4th Cir.1979) ("An agency's interpretation of its own regulations should be accepted by the courts unless it is shown to be unreasonable or inconsistent with statutory authority."). Even if the two challenged factors could not be catalogued within the final rule's specifically enumerated "indicators," we would uphold the agency's reliance upon those factors as a sound and permissible application of an open-ended rule that not only does not purport to provide an exhaustive list of relevant factors, but affirmatively recites that its listed factors are not all-inclusive. See 7 C.F.R. § 273.9(c)(11)(i) ("Some indicators of purpose are...." (emphasis added)); see also Final Rule Preamble, 48 Fed.Reg. at 16,828; Proposed Rule Preamble, 47 Fed.Reg. at 40,445. We therefore reject Maryland's argument that USDA review of the state's requests entailed consideration of "factors not published in [USDA] regulations." Appellees' Br. at 24.
 
 C.
 
 50
 Having resolved appellees' challenges to the content and validity of USDA's energy assistance rule, we turn to Maryland's contention that USDA's application of the rule to deny the state's exclusion requests was "arbitrary and capricious, an abuse of discretion, and contrary to law because Maryland satisfied" the five indicators of purpose set forth in the rule. Appellees' Br. at 26. Because USDA did not dispute Maryland's fulfillment of two of the indicators, we consider only the following three indicators: (1) whether Maryland had "directly tied" its proposed energy assistance to "studies, surveys, or reports evaluating home energy costs," (2) whether its assistance was "limited to households which receive PA or GA," and (3) whether the assistance was "provided only to households which actually incur home energy costs." 7 C.F.R. § 273.9(c)(11)(i).[11] In determining whether agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), we perform "only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes," Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983), and whether the agency has committed "a clear error of judgment," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); accord, e.g., Duke Power Co. v. United States Nuclear Regulatory Comm'n, 770 F.2d 386, 390 (4th Cir.1985). "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Overton Park, 401 U.S. at 416, 91 S.Ct. at 823. Finding that USDA's analysis under each of the indicators comports with its statutory mandate and is supported by substantial record evidence, we uphold USDA's application of the energy assistance rule in denying Maryland's exclusion request.
 
 1.
 
 51
 Maryland first contends that it "directly tied" its proposed energy assistance to "studies, surveys, or reports evaluating home energy costs." 7 C.F.R. § 273.9(c)(11)(i)(D). This contention rests on what counsel described at oral argument as Maryland's "gap" interpretation of the energy assistance exclusion. Under this interpretation, "[a]s long as there remain[s] [a documented] energy gap" between actual household energy costs and designated energy assistance, the state would be conclusively "entitled to target scarce public funds to meet energy costs." Appellees' Br. at 31. In other words, any designated energy assistance not exceeding recipients' documented, unmet household energy costs would entitle the state to an exclusion. Because not all energy costs incurred by Maryland's low-income households are currently covered by energy assistance payments, the state contends, the exclusion is available. Maryland's argument, if accepted, would render USDA's action arbitrary and capricious because "with no explanation, the agency failed altogether to consider the 'gap.' " Id. at 30.
 
 
 52
 We reject Maryland's argument. Acceptance of this argument would require that we adopt the state's interpretation of the statute over the agency's. As noted above, we are required by Chevron to defer to USDA's interpretation of the Food Stamp Act. Therefore, whether Maryland's "gap" interpretation is consistent with the statute or even preferable to USDA's interpretation is irrelevant. Having concluded that USDA's interpretation of the statute is a permissible one, we need not consider whether "the agency construction was the only one it permissibly could have adopted ... or even the reading [we] would have reached" on our own. Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. By insisting that its "gap" interpretation is consistent with the Food Stamp Act and that "USDA can offer no authority to [show] that this approach was inconsistent with congressional intent," Appellees' Br. at 31, Maryland would turn Chevron analysis on its head. In effect, Maryland wants USDA to bear the burden of showing affirmatively that the state's interpretation of the statute is inconsistent with congressional intent. See Appellants' Reply Br. at 12. This the agency is not required to do.
 
 
 53
 Unable to avail itself of the "gap" interpretation of the statute, Maryland cannot satisfy the final rule's requirement that the state "directly tie[ ]" its proposed energy assistance to "studies, surveys, or reports evaluating home energy costs." 7 C.F.R. § 273.9(c)(11)(i)(D). "[T]he non-energy assistance portion" of Maryland's welfare grants "stopped increasing after [its] first energy assistance exclusion was approved." J.A. at 266. In fact, after fiscal year 1981 (the first fiscal year in which energy assistance exclusions under the Food Stamp Act were available), the only welfare increases enacted by Maryland "were repeated increases in the energy allowance." Id. During this same period, however, household energy costs in Maryland stabilized or actually declined. Between fiscal year 1983 (the last time USDA had granted Maryland an energy assistance exclusion) and fiscal year 1985, average home energy costs declined 3.4 percent. See id. at 223. Between fiscal years 1983 and 1987, costs declined 4 percent. See id. at 265. During this period, the energy assistance component of Maryland's welfare grants progressively ballooned. Maryland's own data showed that the average monthly "home heating component of [the] total AFDC payment" grew from $9 in fiscal year 1982 to $34 in fiscal year 1983, $52 in fiscal year 1985, and $68 in fiscal year 1986. Id. at 229. Between fiscal years 1982 and 1986, average monthly home heating costs fluctuated between $73 and $79, finally stabilizing at $77. See id. The rapid escalation in energy assistance during this period of relatively flat energy costs resulted in a continual and substantial increase in the percentage of energy costs covered by the home heating component of Maryland's grants: 12.3 percent in fiscal year 1982, 43.0 percent in fiscal year 1983, 67.5 percent in fiscal year 1985, and finally 88.3 percent in fiscal year 1986. See id.; cf. id. at 225 ("[W]elfare grants in Maryland for 1986 only meet 77.8 percent of [overall] need, and yet the energy assistance exclusion for 1986 ... would meet 88.3 percent of the actual costs of home heating."). In sum, Maryland's own "studies, surveys, or reports" showed that its energy assistance increases were not "directly tied" to "home energy costs." 7 C.F.R. § 273.9(c)(11)(i)(D). We cannot find therefore that USDA acted arbitrarily or capriciously in denying Maryland's exclusion requests on the basis of this data.
 
 
 54
 We also reject the district court's characterization of USDA's decisions as inconsistent with the agency's treatment of prior exclusion requests by Maryland and other states. See 772 F.Supp. at 1564-65; J.A. at 296-97, 307 n. 17. The district court concluded that USDA had treated similar requests differently. It noted that although Maryland's applications for fiscal years 1983, 1985, 1986, and 1987 differed only "with regard to energy cost figures for the specific year of application," the agency granted the first two requests but denied the last two. 772 F.Supp. at 1564; see also J.A. at 296. We agree with USDA that the "caveat" in the district court's statement--namely, that the only difference among the requests was the energy costs preceding the years of application--"is enormous and swallows the general observation," since "energy costs are precisely the focus" of USDA's final rule. Appellants' Reply Br. at 11. If USDA may properly consider energy costs in the year of a state's exclusion request, it may also distinguish between requests during periods when energy costs are rising and requests filed when energy costs are stable or even declining. The magistrate judge acknowledged that USDA did not single out Maryland for "application of the annual increased energy cost policy." J.A. at 307 n. 17; see also 772 F.Supp. at 1565. Rather, USDA consistently considered exclusion requests against the backdrop of trends in energy costs. See, e.g., J.A. at 197 (USDA letter denying an exclusion request by New Jersey with the observation that "the only allowance increase in the last two years has been the energy allowance while at the same time ... energy prices have stabilized").
 
 
 55
 As to USDA's consideration of Maryland's record of multiple exclusion requests, the district court accepted the magistrate judge's finding that "USDA had considered the number of exclusion applications made by Maryland as one ground for denying those requests," which in turn was based on the fact that "USDA had granted the request of Kansas for [fiscal year] 1985 [partly] because that was the state's first request." 772 F.Supp. at 1565; see also J.A. at 307 n. 17 (magistrate judge's report).[12] The district court concluded that there was "no congressional intent to support USDA's use of this ... criterion." 772 F.Supp. at 1565. Maryland does not dispute that "USDA has never applied a rule that no more than two exclusions will be approved for any single state." Appellants' Reply Br. at 7. The state contends, however, that its exclusion request met harsher treatment on the indefensible ground that the state had filed multiple requests. See Appellees' Br. at 23-24, 31 n. 14.
 
 
 56
 We believe that Maryland and the district court misconstrued the significance of USDA's relaxed posture toward first-time exclusion requests and, concomitantly, the relevance to USDA of Maryland's successive exclusion applications. USDA "could reasonably conclude that a state's first effort to assist its low-income citizens in coping with" energy costs raised by energy crisis of the 1970s "was not suspect simply because it came at a time when energy prices had finally leveled off." Appellants' Reply Br. at 8 n. 3. By contrast, as we have already observed, the record reflects that Maryland was enacting repeated increases in energy assistance over an extended period of stable or declining energy costs. USDA could reasonably infer from the overall pattern of Maryland's activity that the state had undertaken a concerted effort to shift a greater portion of its welfare grants to energy assistance grants that would be excluded from income for food stamp purposes.[13]
 
 
 57
 It may well be, as the magistrate judge observed, that USDA's "policy de facto requires a state to make up for the huge increase in home energy costs" caused by the energy crisis of the late 1970s "in one or two years," because the agency's focus on year-to-year trends in energy costs and individual states' history of exclusion applications constrains the ability of certain states "to spread [energy] assistance out over several years and still qualify for the exclusion." J.A. at 316. This is a policy choice that the federal judiciary must respect, however, upon USDA's demonstration that its interpretation of the Food Stamp Act is consistent with congressional intent and that its application of the statute and final rule in rejecting Maryland's exclusion requests was not arbitrary, capricious, or an abuse of discretion. We cannot countenance judicial interference with a federal agency's expert policy decisions on the ground relied upon by the magistrate judge, that a "state must be granted the autonomy to decide how best to meet the needs of its low-income citizens." Id. Having concluded that USDA reasonably determined that Maryland's proposed welfare increases did not serve "the purpose of providing energy assistance," 7 U.S.C. § 2014(d)(11), we have no authority to intercede in Maryland's policy dispute with USDA.
 
 2.
 
 58
 In its second attack on USDA's application of the energy exclusion rule, Maryland argues that the state satisfactorily showed that its proposed "energy assistance is not limited to households which receive" public assistance (PA) or general assistance (GA). 7 C.F.R. § 273.9(c)(11)(i)(A). USDA acknowledges that "energy assistance can legitimately be provided through PA and GA increases as part of a coordinated State plan ... which will reach all low income households." J.A. at 222 (emphasis added). The agency included this indicator within its energy assistance rule, however, because payments combined with PA or GA are particularly susceptible to the kind of state and local legislative abuse that prompted Congress to amend the statute and USDA to promulgate its rule. See Proposed Rule Preamble, 47 Fed.Reg. at 40,444.
 
 
 59
 Although "[a]ll low-income households which receive food stamps would experience similar energy costs and should benefit from food stamp income exclusions in a like manner," J.A. at 222 (USDA letter), Maryland does not and cannot contend that its grant increases extended energy assistance to low-income households receiving neither PA nor GA. Rather, it argues that its PA and GA increases, combined with the provision of energy assistance to 75,000 households in the separate Maryland Energy Assistance Program (MEAP), constituted a " 'coordinated State plan for energy assistance which will reach all low-income households in the State.' " Appellees' Br. at 35 (quoting USDA letter, J.A. at 222). Maryland's reference to MEAP, however, is unresponsive to USDA's regulatory concern; MEAP's existence does not alter the undisputed fact that the energy assistance Maryland sought to have excluded would benefit only PA and GA recipients. In any event, the fact that approximately 19,000 PA and 3,800 GA households receive energy assistance through both MEAP and their basic welfare grant, see J.A. at 168, 271, belies the claim that Maryland has developed a "coordinated State plan for energy assistance." The disputed energy assistance enhancements to PA and GA grants represented a potential windfall for these households in particular, since they were already receiving energy assistance through MEAP during a period of relatively stable energy costs.
 
 3.
 
 60
 Finally, Maryland argues that it sufficiently showed that "energy assistance [was] provided only to households which actually incur[red] home energy costs." 7 C.F.R. § 273.9(c)(11)(i)(B). Maryland admits that its "grants went to all public assistance households, regardless of whether they made direct utility payments." Appellees' Br. at 38. But it contends that this practice was defensible under the energy assistance provision, because in low-income households that do not pay their own energy bills, " 'increases in home heating costs are invariably passed along in higher rents.' " Id. at 39 (quoting J.A. at 249). This appears to be one of MEAP's operating microeconomic assumptions, and Maryland rested on this assumption as the sole justification for its failure to adduce more specific proof that all energy assistance recipients incurred actual home energy costs. See J.A. at 55, 222, 249, 264; see also Appellees' Br. at 38 n. 17 (defending the "logical assumption that a household whose landlord paid energy costs directly would still incur energy expenses in the form of higher rent"). As USDA correctly noted in denying the first disputed request, however, "[t]he fact that MEAP does not require evidence of actual home energy costs has no bearing" on a federal regulation requiring "USDA to take into consideration whether households have actual energy costs." J.A. at 222. Maryland's argument that USDA has not shown that recipient households have not incurred actual energy costs, see Appellees' Br. at 38, is therefore misdirected.
 
 
 61
 At bottom, Maryland simply failed to discharge its affirmative burden to produce evidence that its energy assistance grants would benefit "those who can show that they must pay for their energy costs out of household income" instead of "those who have heating costs subsidized." J.A. at 222 (USDA letter). Maryland attempts to shift this burden to USDA by resort to economic assumptions unsupported by actual evidence,[14] and we decline its invitation to require that USDA construe and apply the energy assistance rule by reference to an economic assumption as to the likelihood that landlords will pass on higher energy costs to tenants. Cf. Kansas v. Utilicorp United, Inc., 497 U.S. 199, ----, 110 S.Ct. 2807, 2816, 111 L.Ed.2d 169 (1990).[15]
 
 D.
 
 62
 Doubtless Congress intended the energy assistance exclusion to relieve low-income households of the grisly choice "between heating or eating" when energy cost spikes outstrip these households' limited means. H.R.Rep. 106, 97th Cong., 1st Sess. 257 (1981). But Congress never intended to confer upon states a license to shift their welfare costs to the federal treasury through manipulation of the energy assistance exclusion. Consistent with its mandate to police potential abuse of the exclusion, USDA has denied Maryland's exclusion requests through a reasonable interpretation and application of the Food Stamp Act and the energy assistance rule. We cannot overturn USDA's rejection of Maryland's exclusion requests as grounded in an unlawful agency interpretation of the Food Stamp Act, as entailing the application of regulatory factors not encompassed by a properly promulgated agency rule, or as constituting an action that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. It is evident that USDA lawfully denied the disputed exclusion requests after thorough consideration of all of the relevant factors, including Maryland's successive applications during periods of relatively stable energy costs and Maryland's disproportionate increases in energy assistance grants during such periods of stable costs. Accordingly, we reverse the grant of summary judgment in No. 91-2370 and order the district court on remand to enter summary judgment for USDA.
 
 III.
 
 63
 We now turn to USDA's appeal in No. 85-2043 from the district court's preliminary injunction. The effect of this injunction is undisputed. It bars USDA from ever recovering federal food stamp funds paid to Maryland as a result of the state's unilateral exclusion of energy assistance from food stamp recipients' income. See 617 F.Supp. at 416; J.A. at 219. The injunction limits USDA to prospective relief only; all sums paid under Maryland's unlawfully claimed exclusions for fiscal years 1986 and 1987 would remain unrecoverable. Finding, for four independent reasons, that such extraordinary relief is offensive to fundamental principles of equity and constitutional law, we vacate the injunction.
 
 A.
 
 64
 First, the injunction deprives USDA of the right to pursue the numerous statutory remedies available to the agency for recouping overpayments and enforcing penalties, sanctions, and other administrative remedies. An injunction may not strip a federal agency of its power to exercise lawful authority conferred by Congress through statute. "A federal court, whether in law or in equity, has no authority to depart from the clear command of a statute in order to effect a result that it believes to be ... dictated by general principles of fairness." Thomas v. Whalen, 962 F.2d 358, 363 (4th Cir.1992); see also INS v. Pangilinan, 486 U.S. 875, 883, 108 S.Ct. 2210, 2215, 100 L.Ed.2d 882 (1988); Hedges v. Dixon County, 150 U.S. 182, 192, 14 S.Ct. 71, 74, 37 L.Ed. 1044 (1893) ("Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law."); Rees v. City of Watertown, 86 U.S. (19 Wall.) 107, 122, 22 L.Ed. 72 (1874).
 
 
 65
 That equity is powerless to restrict a federal agency's performance of lawful statutory duties is unmistakably clear from a series of Supreme Court cases--analogous in their facts to this case--rejecting challenges to restrictions on the federal government's authority to recoup misused federal funds transferred under Title I of the Elementary and Secondary Education Act.[16] In Bell v. New Jersey, 461 U.S. 773, 782-87, 103 S.Ct. 2187, 2192-96, 76 L.Ed.2d 312 (1983), the Court held that the Department of Education could recover misused Title I funds from states that violated assurances that federal grants would be spent only on eligible programs.[17] Subsequently, the Court rejected two attempts by states to negate on equitable grounds the federal government's express statutory entitlement to recover misused funds. The Court refused to uphold a lower court order permitting New Jersey to retain misused Title I funds on the ground urged by the state that the lower court had "reached an equitable result." Bennett v. New Jersey, 470 U.S. 632, 645, 105 S.Ct. 1555, 1563, 84 L.Ed.2d 572 (1985). The Court reasoned that "Congress ha[d] already accommodated equitable concerns in ... statutory provisions governing recovery of misused funds," and therefore that a court reviewing the agency's determination "that funds were misused under [applicable] legal standards.... has no independent authority to excuse repayment based on [the court's] view of what would be the most equitable outcome." Id. at 646, 105 S.Ct. at 1563. And in Bennett v. Kentucky Dep't of Educ., 470 U.S. 656, 665, 105 S.Ct. 1544, 1550, 84 L.Ed.2d 590 (1985), the Court rejected a claim that a state could "avoid repayment by showing that improper expenditures were made in good faith."
 
 
 66
 In a case similar to the one before us, the District of Columbia Circuit recently reached the same conclusion that equity may not interfere with a federal agency's statutory authority to recover overpayments made under a subsequently invalidated court order. See National Kidney Patients Ass'n v. Sullivan, 958 F.2d 1127, 1134-37 (D.C.Cir.1992). The court of appeals held that the district court lacked jurisdiction to impose a preliminary injunction requiring payments by the Department of Health and Human Services (HHS) to a supplier of medical services covered by Medicare. See id. at 1129-34. HHS then sought to recoup millions of dollars in Medicare overpayments to the supplier made while the invalid injunction was in effect. The court of appeals recognized HHS' right to "recover in restitution sums not covered by a bond but paid to a plaintiff as a result of a subsequently invalidated injunction," id. at 1136 (emphasis omitted), and without "address[ing] the exact formulae for restitution," vacated "the district court judgment to the extent it purport[ed] to interfere" with HHS' resort to statutory procedures for recoupment of Medicare overpayments, id. at 1137; cf. Turner v. McMahon, 830 F.2d 1003, 1007-08, 1009 (9th Cir.1987) (holding that a state may enforce its statutory entitlement to recoup AFDC overpayments from individual recipients where the state had made those overpayments under an erroneous, subsequently reversed court order), cert. denied, 488 U.S. 818, 109 S.Ct. 59, 102 L.Ed.2d 37 (1988).
 
 
 67
 Congress, in the Food Stamp Act, has provided USDA enforcement powers and remedial authority similar to that provided to the Department of Education under Title I and to HHS under the Medicare program. When USDA determines that a state has been negligent in making food stamp eligibility determinations, the agency may require the state to repay the value of resulting food stamp overissuances. See 7 U.S.C. § 2020(h). It may impose monetary penalties against a state with a high "payment error rate" in determining food stamp eligibility and benefit levels. Id. § 2025(c), (d); see also 7 C.F.R. § 275.23. It may withhold federal financial assistance from a state's food stamp program. See 7 U.S.C. § 2020(g). It may also reduce the federal payment of a state's administrative costs if the state fails "without good cause to comply with any of the" statutory or regulatory provisions governing the federal food stamp program, id., or reduce the federal payment of state administrative costs "to collect unpaid claims assessed against the State agency," id. § 2022(a)(1); see also id. § 2023(a); 7 C.F.R. § 276.4.
 
 
 68
 USDA is entitled under this statutory scheme to recoup the overissuances Maryland has received in contravention of the Food Stamp Act. This statutory entitlement forecloses any equitable attempt, whether by injunction or otherwise, to bar USDA from recovering the overissuances.
 
 B.
 
 69
 The district court's preliminary injunction also violates the Appropriations Clause of the Constitution.[18] The "straightforward and explicit" Appropriations Clause " 'means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.' " Office of Personnel Mgmt. v. Richmond, 496 U.S. 414, 424, 110 S.Ct. 2465, 2471, 110 L.Ed.2d 387 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321, 57 S.Ct. 764, 770, 81 L.Ed. 1122 (1937)). Although Richmond addressed the requirements of the Appropriations Clause in the context of an equitable estoppel against the federal government, the Court observed that "[a]ny exercise of a power granted by the Constitution to" the judicial branch "is limited by a valid reservation of congressional control over funds in the Treasury." Id. at 425, 110 S.Ct. at 2472 (emphasis added); accord Rochester Pure Waters Dist. v. EPA, 960 F.2d 180, 184, 186 (D.C.Cir.1992) (holding that a court order requiring an executive agency to set aside funds from an appropriation rescinded by Congress violates the Appropriations Clause).
 
 
 70
 By preventing USDA from exercising statutory authority to recover funds drawn on the federal treasury in violation of the Food Stamp Act, the district court's preliminary injunction effectively transfers federal funds to Maryland without an appropriation. Such judicial action offends the Appropriations Clause no less than does a constitutionally impossible "estoppel claim for money in violation of a statute." Richmond, 496 U.S. at 430, 110 S.Ct. at 2474. If allowed to stand, the preliminary injunction would cloak Maryland's illegally obtained funds with "the practical force of law, in violation of the Constitution," and would frustrate the purpose of the Appropriations Clause" to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to ... the individual pleas of litigants." Id. at 428, 110 S.Ct. at 2473.
 
 C.
 
 71
 Even were we to consider the preliminary injunction solely under traditional principles of equity and without reference to the statutory and constitutional doctrines outlined above, we would still vacate the district court's order. Equity recognizes the restitutionary "principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." Arkadelphia Milling Co. v. St. Louis S.W. Ry. Co., 249 U.S. 134, 145, 39 S.Ct. 237, 242, 63 L.Ed. 517 (1919); accord, e.g., Kidney Patients, 958 F.2d at 1136-37 (holding that Arkadelphia entitles a federal agency to restitution of amounts overpaid under a subsequently invalidated injunction); Greenwood County v. Duke Power Co., 107 F.2d 484, 487 (4th Cir.1939), cert. denied, 309 U.S. 667, 60 S.Ct. 608, 84 L.Ed. 1014 (1940).[19] The equitable nature of restitution ordinarily permits a court to award "restitution upon the reversal of a judgment" to the extent of one party's unjust enrichment. Atlantic Coast Line R.R. Co. v. Florida, 295 U.S. 301, 310, 55 S.Ct. 713, 716, 79 L.Ed. 1451 (1935); accord, e.g., Greenwood, 107 F.2d at 488. It is plain that Maryland was unjustly enriched to the extent it received food stamp grants and federal administrative funds in contravention of the requirements of the Food Stamp Act and USDA's regulations. To forbid recoupment of these unlawfully transferred federal funds even though USDA has prevailed on the merits of this dispute clearly would deprive the agency of its equitable entitlement to restitution. See Kidney Patients, 958 F.2d at 1136-37. We need not decide whether USDA would be entitled to recover all overissuances on a theory of restitution alone, because Congress has provided a statutory mechanism for recovery of overissuances. See id. at 1137. It is sufficient in this context that USDA be restored its statutory rights that were essentially suspended by the district court's injunction. See id. (ordering the district court to allow HHS to apply the agency's "elaborate procedures for recoupment of [Medicare] overpayments to suppliers").
 
 D.
 
 72
 The district court's error in failing to require Maryland to post an injunction bond provides a fourth ground for vacating the preliminary injunction. The district court denied USDA's request under Fed.R.Civ.P. 65(c) that Maryland be required to post security before any preliminary injunction issued, accepting Maryland's representation that the state could pay any judgment ultimately entered against it.
 
 
 73
 The Federal Rules of Civil Procedure direct that "[n]o ... preliminary injunction shall issue except upon the giving of security by the applicant ... for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." Fed.R.Civ.P. 65(c). Unlike the computation of the bond amount, which may be set "in such sum as the court deems proper," id., the decision whether to require a bond is strictly circumscribed by the terms of Rule 65(c). See Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 210 (3d Cir.1990); Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 103 (3d Cir.1988). The rule's only exception to the security requirement exempts "the United States or ... an officer or agency thereof." Fed.R.Civ.P. 65(c).[20] Failure to require a bond before granting preliminary injunctive relief is reversible error.[21]
 
 
 74
 The district court's refusal to require a bond cannot be defended as the reasonable exercise of discretion to set a "sum as the court deems proper." "To the extent that the district court's" refusal to require a bond "is based on a determination that complying with the preliminary injunction raised no risk of harm ..., that determination is clearly erroneous." Hoxworth, 903 F.2d at 210. It is evident from Maryland's own representations of the " 'staggering' " amounts of food stamp funds affected by the preliminary injunction, Appellees' Br. at 42 (quoting 617 F.Supp. at 414),[22] that the injunction exposed USDA and the federal food stamp program to substantial financial losses.[23]E.
 
 
 75
 We turn, finally, to two arguments Maryland has offered in defense of the district court's preliminary injunction. Neither argument overcomes the four independent grounds we have identified for vacating the injunction.
 
 1.
 
 76
 We reject Maryland's argument that the preliminary injunction may be affirmed as essentially nothing more than a prohibition on the retroactive application of a "new" interpretation of the Food Stamp Act. Appellees' Br. at 44. The state misplaces its reliance in this regard on Lehman v. Burnley, 866 F.2d 33 (2d Cir.1989). In Lehman, the Coast Guard originally informed states that both state and local expenditures for boating safety programs would qualify for matching federal funds. See id. at 35. After New York had contracted to reimburse localities for the costs of their boating safety programs on the understanding that local expenditures qualified for federal funds, the Coast Guard reversed its position, declared that local expenditures did not qualify, and retroactively reduced the state's federal grant. See id. The Second Circuit held that because the state had "relied to its detriment on the former rule," the Coast Guard "should be estopped from applying the [new] rule retroactively." Id. at 38.
 
 
 77
 The case before us is distinguishable from Lehman on at least two grounds. First, as we discussed in part II.C.1. supra, USDA has not changed its interpretation of the energy assistance exclusion. USDA applied criteria consistent with its longstanding final rule and adhered to past practice. Consequently, Maryland cannot characterize USDA's action as the "retroactive" application of a new interpretation, as it must to benefit from the holding in Lehman. Second, unlike the state of New York in Lehman, Maryland can hardly claim detrimental reliance; it implemented its grant increases as excluded energy assistance over USDA's recorded objections. Cf. West Augusta Dev. Corp. v. Giuffrida, 717 F.2d 139, 141 (4th Cir.1983). By contrast, New York acted upon the Coast Guard's explicit representation that local expenditures would receive federal matching funds. See Lehman, 866 F.2d at 35. We therefore find Lehman wholly inapposite.[24]2.
 
 
 78
 We also find no merit in Maryland's contention that USDA "abandoned any effort to obtain a swift adjudication" of the district court's preliminary injunction, Appellees' Br. at 40-41, and that USDA should therefore be held responsible for the six-year delay occasioned by its "failure to immediately pursue its challenge of the district court's decision to prospectively apply its decision," id. at 45. USDA's appeal from the preliminary injunction was placed in abeyance pending a decision on the merits upon joint motion of the parties. See Appellants' Br. at 4; Appellees' Br. at 41; Appellants' Reply Br. at 18-19; note 4 supra. Although Maryland contends otherwise, see Appellees' Br. at 46, this is plainly not a case in which USDA made a "tactical choice not to press" for an immediate reversal of the preliminary injunction. Lemon v. Kurtzman, 411 U.S. 192, 204, 93 S.Ct. 1463, 1471, 36 L.Ed.2d 151 (1973) (plurality opinion).
 
 F.
 
 79
 Standing alone, any one of the infirmities identified in parts III.A.-III.D. would require us to vacate the district court's preliminary injunction. The coincidence of all four renders the case for vacating the injunction compelling. USDA must be permitted not only to assert whatever equitable entitlements it enjoys but also to exercise its full statutory authority to enforce the federal Food Stamp Act.
 
 CONCLUSION
 
 80
 The judgment of the district court in No. 91-2370 is reversed, and we remand with instructions to enter summary judgment for USDA. The preliminary injunction in No. 85-2043 is vacated, and we remand with instructions to remove all restraints that would prohibit USDA from pursuing its statutory and equitable remedies to recover the overissuances to Maryland and any recoverable attendant damages.
 
 
 81
 REVERSED IN PART, VACATED IN PART, AND REMANDED
 
 
 82
 HALL, Circuit Judge, concurring in part and concurring in the judgment:
 
 
 83
 I join in the judgment of the court and agree with almost all of the majority's analysis. However, I do not join Part III-B of the majority opinion because I believe that the Appropriations Clause need not, and thus should not, be a basis for our judgment.
 
 I.
 
 84
 Although I join the judgment of the court in No. 85-2043, which vacates the preliminary injunction prohibiting the recoupment of food stamp overissuances to Maryland, I believe the majority engages in judicial overkill in reaching this decision. The majority itself concedes that III-B is unnecessary to reach the result. See maj. op. at 1485. ("Standing alone, any one of the infirmities identified in parts III.A-III.D [of the majority opinion] would require us to vacate the district court's preliminary injunction."). The second "infirmity" is grounded in the Appropriations Clause. Time-honored prudential considerations militate against resting our decision on this basis.
 
 
 85
 In Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), Justice Brandeis set forth "a series of rules under which [the Supreme Court] has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." One of these rules is that constitutional questions will not be decided " 'unless absolutely necessary to a decision of the case.' " Id. at 346-47, 56 S.Ct. at 482-83 (quoting Burton v. United States, 196 U.S. 283, 295, 25 S.Ct. 243, 245, 49 L.Ed. 482). We follow this rule. See Jimenez v. BP Oil, Inc., 853 F.2d 268, 270 (4th Cir.1988) ("It is well established that a court should avoid deciding a constitutional question when it can dispose of a case on another basis." (citing Justice Brandeis's concurring opinion in Ashwander )). The majority offers no reason why this prudential constraint should be ignored in the case before us. Indeed, although I express no opinion on the merits of the majority's analysis of the Appropriations Clause, it appears to me that this area of the law is far from settled. The uncertainty surrounding the issue counsels even greater restraint.
 
 II.
 
 86
 Another reason to jettison the constitutional holding is the lack of argument on the point. The Appropriations Clause is not cited in any of the briefs filed in this appeal, and one has to strain to detect a constitutional argument.* I believe the issue is insufficiently raised as to even bring it before us for our consideration. See Dayton v. Consolidation Coal Co., 895 F.2d 173, 176 (4th Cir.1990) ("[Respondent] made no mention of this due process argument in its brief here, so we do not consider this issue on appeal."). A largely uncharted area of constitutional law should be subjected to the crucible of the adversary process.
 
 
 
 [1]
 We refer herein to the state and federal agencies and their respective secretaries as "Maryland" and "USDA."
 
 
 [2]
 At the time the disputes in this case arose, "any payments or allowances made under ... any State or local laws for the purpose of providing energy assistance" were excluded from "income." 7 U.S.C. § 2014(d)(11) (1982), amended by Pub.L. No. 100-435, § 343, 102 Stat. 1647, 1663-64 (1988); see part II.A. infra
 
 
 [3]
 "Public assistance," or "PA," means partially federally funded benefits such as Social Security or Aid to Families with Dependent Children. "General assistance," or "GA," means wholly state- or locally-funded benefits "intended to promote the health or well-being of recipients." 7 C.F.R. § 271.2
 
 
 [4]
 Although USDA had filed a timely appeal of the preliminary injunction, the parties on November 7, 1985, filed a joint motion to have the appeal held in abeyance pending the district court's disposition on the merits. This court granted the motion by order dated November 27, 1985. By order dated January 6, 1992, we consolidated USDA's appeal from the district court's grant of summary judgment for Maryland with the underlying appeal of the preliminary injunction
 
 
 [5]
 Because Maryland would provide energy assistance "exclusively through PA and GA," USDA took "extra care ... to be sure that the other 'indicators of purpose' [were] satisfactorily addressed." Id. at 222
 
 
 [6]
 See J.A. at 309-13 (citing, inter alia, remarks of Sens. Hatch, Javits, Dole, Pell, and Williams and Rep. Roukema at 125 Cong.Rec. 32,065, 32,070-71, 32,074, 32,090 (Nov. 13, 1979) and 127 Cong.Rec. 24,854 (Oct. 22, 1981))
 
 
 [7]
 In one egregious case, a state reduced its public assistance grant and offset nearly the entire reduction by designating much of the remaining grant as energy assistance. See id. at 33-34
 
 
 [8]
 This language remained in effect during the disputes over Maryland's denied exclusions for fiscal years 1986 and 1987. See note 2 supra
 
 
 [9]
 In enacting this amendment, Congress acknowledged that the 1980 House report continued to represent "the state of current law" insofar as that report described the Food Stamp Act as restricting energy assistance exclusions to payments that were " 'attributable to high heating costs rather than general inflationary conditions.' " 127 Cong.Rec. 31,835 (Dec. 16, 1981) (remarks of Rep. Richmond, manager of the 1981 amendment in the House) (quoting H.R.Rep. 788, supra, at 123, reprinted in 1980 U.S.Code Cong. & Admin.News at 956)
 
 
 [10]
 USDA interpreted the recent amendment to the energy assistance exclusion as further evidence that Congress intended to curb states' abuse of the provision:
 In making [the 1981 amendment], Congress intended.... to close a loophole left by earlier provisions. Under the earlier provisions, State agencies could have allowed the exclusion of portions of their PA or GA grants simply by improperly using the energy assistance designation.... [A] State or local agency could designate a large portion of its existing general assistance grants as energy assistance. Because this would exclude a large portion of the grants from being counted as income, it would cause a significant, perhaps unjustified increase in food stamp benefits.
 Id.
 
 
 [11]
 Maryland suggests that since it has satisfied two indicators of purpose, it needs to prevail on only one of the remaining indicators to secure the requested exclusions. See Appellees' Br. at 27 n. 11 ("Even if Maryland [meets] only three of the five factors, its application should have been approved."); cf. id. at 34. The district court originally had a similar misconception of the USDA rule, but the magistrate judge's report corrected that error. Compare 617 F.Supp. at 413 ("If a state plan meets three of five 'indicators of purpose,' it will probably be approved for exclusion.") with J.A. at 287-88 & n. 7. As noted above, the factors guide USDA's decisions on exclusion requests, but USDA retains the discretion to decide requests on a case-by-case basis. "[T]he existence of any one or all of these factors would not necessarily guarantee" approval of an exclusion request. Proposed Rule Preamble, supra, 47 Fed.Reg. at 40,445. See generally parts I.A. and II.B. supra
 
 
 [12]
 USDA does not dispute this fact. See J.A. at 191; Appellees' Reply Br. at 8 n. 3
 
 
 [13]
 Maryland argues that "the fact that [it] was reapplying [for an exclusion] for a third and fourth time"--more than any other state, see J.A. at 175--"figured significantly in USDA's refusals." Appellees' Br. at 23. The fact that Maryland filed successive applications, however, was of itself not especially significant in USDA's final decision. It was the confluence of Maryland's repeated requests during periods of stable or declining energy costs that proved significant
 
 
 [14]
 For instance, with regard to the MEAP program, Maryland characterizes USDA as adopting two "assumptions ... contrary to congressional intent":
 (1) that MEAP meets the full energy needs of GA recipients who also receive MEAP payments and (2) that some third party other than the state fully pays the energy expenses of GA recipients who do not receive MEAP payments. Appellees' Br. at 38. This bald assertion fails to relieve the state of its "burden under [7 C.F.R. § 273.9(c)(11)(i)(B) ] to show that MEAP does not fully cover [recipients'] energy costs." Appellants' Reply Br. at 18.
 
 
 [15]
 The assumption that landlords who pay their tenants' energy bills will pass on increased energy costs through rent hikes does appear consistent with the federal Low-Income Home Energy Assistance Act of 1981. See 42 U.S.C. § 8622(2) (defining "household" as any "individual or group of individuals who are living together as one economic unit for whom residential energy is customarily purchased in common or who make undesignated payments for energy in the form of rent " (emphasis added)). The energy assistance rule, however, unequivocally directs USDA to consider whether "energy assistance is provided only to households which actually incur home energy costs." 7 C.F.R. § 273.9(c)(11)(i)(B) (emphasis added). We cannot rest our judgment of USDA's decisions under the Food Stamp Act on an economic assumption that may underlie entirely different legislation
 
 
 [16]
 Pub.L. No. 89-10, 79 Stat. 27 (1965), repealed by Pub.L. No. 95-561, § 101(c), 92 Stat. 2143, 2200 (1978)
 
 
 [17]
 Maryland failed to comply with the conditions of its participation in the federal food stamp program by implementing the disputed energy assistance exclusions for fiscal years 1986 and 1987 over USDA's objection. Like the Bell Court, however, we need not decide whether the federal government may enforce "a common-law right to recover funds any time the recipient of a grant fails to comply with the conditions of the grant." Id. at 782 n. 7, 103 S.Ct. at 2193 n. 7
 
 
 [18]
 The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7
 
 
 [19]
 We reject Maryland's suggestion that restitution is not available under the principle set forth in Arkadelphia absent an express agreement securing a right to restitution. See Appellees' Br. at 48-49 (citing 249 U.S. at 138, 39 S.Ct. at 238). We agree with the District of Columbia Circuit that such a restrictive reading of Arkadelphia would "drastically narrow[ ] the principle of restitution" in a way not intended by the Supreme Court. Kidney Patients, 958 F.2d at 1137. Maryland's parsimonious reading of Arkadelphia cannot be squared with the well-established right to "restitution of what one has lost by the enforcement of a judgment subsequently reversed." Northwestern Fuel Co. v. Brock, 139 U.S. 216, 219, 11 S.Ct. 523, 524, 35 L.Ed. 151 (1891); see also, e.g., United States v. Morgan, 307 U.S. 183, 197-98, 59 S.Ct. 795, 802-03, 83 L.Ed. 1211 (1939); Baltimore & O.R.R. Co. v. United States, 279 U.S. 781, 785-86, 49 S.Ct. 492, 493, 73 L.Ed. 954 (1929); Bank of the United States v. Bank of Washington, 31 U.S. (6 Pet.) 8, 17, 8 L.Ed. 299 (1832)
 
 
 [20]
 There are no other exceptions. See Chatz v. Freeman, 204 F.2d 764, 767 (7th Cir.1953). Rule 65(c) "subsumes such generic policy considerations" as the " 'public interest' " in "encouraging plaintiffs to challenge agencies' interpretations of their governing statutes." Kidney Patients, 958 F.2d at 1135
 
 
 [21]
 See, e.g., Hoxworth, 903 F.2d at 209-11; Frank's GMC, 847 F.2d at 103; System Operations, Inc. v. Scientific Games Dev. Corp., 555 F.2d 1131, 1145-46 (3d Cir.1977); Telex Corp. v. International Bus. Machs. Corp., 464 F.2d 1025, 1025 (8th Cir.1972); see also Hopkins v. Wallin, 179 F.2d 136, 137 (3d Cir.1949) (describing a Rule 65(c) bond as a "condition precedent" to the issuance of a preliminary injunction); cf. Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir.1987) (holding that a district court's complete failure to consider a Rule 65(c) request for an injunction bond was error); Reinders Bros., Inc. v. Rain Bird E. Sales Corp., 627 F.2d 44, 54 (7th Cir.1980) (same); Roth v. Bank of the Commonwealth, 583 F.2d 527, 538-39 (6th Cir.1978) (same), cert. dismissed, 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979)
 
 
 [22]
 Maryland estimates that in-state food stamp recipients may have received $36.7 million in disputed benefits. See Appellees' Br. at 42. Maryland also estimates that USDA may be able to recover an additional $133 million in administrative funds and $21 million in fiscal sanctions against the state. See id. at 42-43
 
 
 [23]
 The virtual certainty that USDA would suffer substantial monetary damage from an injunction forcing it to dispense funds in accordance with Maryland's disputed exclusions distinguishes this case from those recognizing a district court's discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm, see, e.g., International Controls Corp. v. Vesco, 490 F.2d 1334, 1356 (2d Cir.), cert. denied, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); Scherr v. Volpe, 466 F.2d 1027, 1035 (7th Cir.1972); Continental Oil Co. v. Frontier Ref. Co., 338 F.2d 780, 782 (10th Cir.1964); Orleans Parish School Bd. v. Bush, 252 F.2d 253, 255 (5th Cir.), cert. denied, 356 U.S. 969, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958); Urbain v. Knapp Bros. Mfg. Co., 217 F.2d 810, 815-16 (6th Cir.1954), cert. denied, 349 U.S. 930, 75 S.Ct. 772, 99 L.Ed. 1260 (1955), and where the court acts merely to preserve its subject-matter jurisdiction, see Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir.1961); Magidson v. Duggan, 180 F.2d 473, 479 (8th Cir.), cert. denied, 339 U.S. 965, 70 S.Ct. 1000, 94 L.Ed. 1374 (1950), or merely to ensure judicial review of administrative action, see People ex rel. Van De Kamp v. Tahoe Regional Planning Agency, 766 F.2d 1319, 1325-26 (9th Cir.), amended, 775 F.2d 998 (9th Cir.1985); Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 167, 168 (D.D.C.1971), aff'd on other grounds, 458 F.2d 827 (D.C.Cir.1972)
 
 
 [24]
 We are not persuaded by Lehman in any event. The Supreme Court has never explicitly held that the federal government may be equitably estopped, see, e.g., Richmond, 496 U.S. at 426-32, 110 S.Ct. at 2472-76; Heckler v. Community Health Servs., 467 U.S. 51, 60 & n. 12, 104 S.Ct. 2218, 2224 & n. 12, 81 L.Ed.2d 42 (1984); INS v. Miranda, 459 U.S. 14, 19, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982); Schweiker v. Hansen, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981); INS v. Hibi, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973); Montana v. Kennedy, 366 U.S. 308, 314-15, 81 S.Ct. 1336, 1340-41, 6 L.Ed.2d 313 (1961), and it is doubtful that the Court would recognize an estoppel where, as in Lehman, affirmative misconduct by the government was not even alleged. With one narrow exception not applicable here, see United States v. Cox, 964 F.2d 1431, 1434-35 & n. * (4th Cir.1992) (estopping one federal agency for the benefit of another federal agency where the transfer of funds would be consistent with "budgetary expenditures ... for which" the estopped agency has "previously accepted financial responsibility"), this court has repeatedly declined to find equitable estoppel against the federal government absent a showing of affirmative misconduct. See, e.g., Nealon v. Stone, 958 F.2d 584, 589 (4th Cir.1992); Keener v. Eastern Assoc. Coal Corp., 954 F.2d 209, 214 n. 6 (4th Cir.1992); Zografov v. V.A. Medical Center, 779 F.2d 967, 969-70 (4th Cir.1985); Zimmermann v. Heckler, 774 F.2d 615, 617-18 (4th Cir.1985); United States v. Tull, 769 F.2d 182, 187-88 (4th Cir.1985), rev'd on other grounds, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). Additionally, Lehman predates Richmond and does not address how its finding of estoppel can be squared with the Appropriations Clause
 
 
 *
 OPM v. Richmond, 496 U.S. 414, 423-27, 110 S.Ct. 2465, 2471-72, 110 L.Ed.2d 387 (1990), is cited on page 24 of appellant's 25-page reply brief for the proposition that "a court may not use its equitable power to appropriate federal funds in a manner inconsistent with federal statute." The argument was not pursued during oral argument