**DUKE POWER COMPANY, Petitioner,**

**v.**

**UNITED STATES NUCLEAR REGULA-TORY COMMISSION, and United States of America, Respondents.**

No. 84–1866.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1985.

Decided June 24, 1985.

---

J. Michael McGarry, III, Washington, D.C. (David A. Repka, Bishop, Liberman, Cook, Purcell & Reynolds, Washington, D.C., Steven C. Griffith, Jr., Albert V. Carr, Jr., Washington, D.C., Ronald V. Shearin, on brief), for petitioner.

Peter G. Crane, U.S. Nuclear Regulatory Com'n, Washington, D.C. (Herzel H.E. Plaine, Gen. Counsel, William H. Briggs, Jr., Sol., Peter R. Steenland, Jr., Chief, Appellate Section, Jacques B. Gelin, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., on brief), for respondents.

Before RUSSELL, HALL and PHIL-LIPS, Circuit Judges.

PER CURIAM.

The petitioner, Duke Power Company (Duke), seeks review under 28 U.S.C. § 2342(4) (1983) of a decision of the Nuclear Regulatory Commission (Commission) denying its request for exemption from the Commission's requirements for a near-site Emergency Operations Facility (EOF) at any nuclear power plant. Duke proposed to place the EOF for its Oconee Nuclear Plant, located in Oconee County, South Carolina, at a distance from the Plant considerably greater than that allowed under the Commission's requirements, i.e. at Duke's general offices in Charlotte, North Carolina, located 125 air miles from the Oconee Plant.

The regulations and guidelines in question were issued by the Commission under the responsibility and authority given it by the Energy Reorganization Act of 1974, 42 U.S.C. § 5841, to license and regulate the construction and regulation of nuclear power plants in a manner so as, among other things, to ensure the public safety in the operation of such plants. Prior to 1979, these regulations provided specific standards to be observed in assuring on-site safety both during operations and in an emergency, but there was a dearth of regulations and standards governing off-site safety planning and procedures in an emergency. The accident at the Three Mile Island Nuclear Plant in 1979 alerted the public to the problems that may arise both on-site and off-site in the event of a nuclear accident. As a result, a Presidential Commission was created to investigate the accident at Three Mile Island and to submit recommendations for dealing with possible future accidents.

The Presidential Commission proceeded promptly with its investigation and submitted a report with extensive recommendations. Since we are concerned only with the recommendations relating to off-site actions, we confine our discussion of the Presidential Commission's Report to its rec-ommendations in the off-site area. It found that, while the licensee and federal, state, and local agencies had responsibilities for off-site responses to radiation releases from a plant in the case of an accident, the existing emergency plans "had no mechanisms for establishing reliable communications among the on-site and the several off-site organizations responsible for various aspects of the emergency response"; in fact, it concluded that "[a]t all levels of government, planning for the off-site consequences of radiological emergencies at nuclear power plants has been characterized by a lack of co-ordination and urgency." President's Commission on the Accident at Three Mile Island, *The Need for Change: The Legacy of TMI* 61–62 (1979). It commented particularly on the delays at the Three Mile Island accident in communications between the site and the Commission's Incident Response Center in Bethesda, Maryland. As a consequence of these delays, it said an evacuation in that case was recommended on the basis of "fragmentary and partially erroneous information." *Id.* at 61. The accident convinced the Nuclear Regulatory Commission, according to the Report of the Presidential Commission, that during the emergency, evacuation plans were required "for distances of 10 and 20 miles from the plant." *Id.* at 62. The Commission responded to these recommendations of the Presidential Commission with extensive new regulations for emergency planning and preparedness at all nuclear power plants. The Commission issued regulations and guidelines, compliance with which were required of all licensees of nuclear power plants, governing action in the event of an emergency at such plants. Under these regulations and guidelines of the Commission, licensees of nuclear power plants are required to establish certain emergency response facilities. One is the Technical Support Center (TSC), to be located on-site close to the control room of the plant and to operate as the primary on-site communications center during any emergency. The second is the Operational Support Center (OSC), located also on-site, to which all

support personnel are to report for assignment of duties in an emergency. Lastly, there is the EOF, which is charged with the management of overall licensee emergency response, the coordination of radiological and environment assessment, the development of recommendations for public protective action, and the coordination of emergency response activity with Federal, State, and local agencies. This latter facility was to be staffed with licensee, Commission, State, and local personnel. It was estimated that some thirty-five persons would be included in the staffing. Under the plan of operation of the EOF, the licensee was to provide for "an on-site emergency coordinator who [should] be in charge of the exchange of information with off-site authorities responsible for coordinating and implementing off-site emergency measures."

The Commission provided for alternative ways for a licensee to meet the requirements for the near-site emergency operations facility. It could establish and maintain either two EOF's, one of which would be within 10 miles of the plant and the other between 10 and 20 miles of the plant, or a single EOF, to be located more than 10 miles from the plant but not more than 20 miles away from the plant without specific approval of the Commission. The regulations provide that with the specific approval of the Commission and some provision for a Commission team closer to the site, the EOF might be located more than 20 miles from the reactor.

The controversy here concerns the establishment of an EOF to service the Oconee Nuclear Plant located in Oconee, South Carolina. Duke, the licensee of the Plant, seeks to meet the requirements for an EOF by establishing two such facilities. Under its request for approval of its plan of compliance, one of these facilities would be located within 10 miles of the site of the Plant but the second would be located 125 air miles from the plant site at Duke's main

headquarters in Charlotte, North Carolina, where it maintains EOFs for two other nuclear plants, both of which are within 20 miles of these other nuclear plants. In effect, Duke wishes to operate a single EOF to service, in the case of an emergency, three separate nuclear plants, one within 15 miles, a second within 20 miles, and the third (the Oconee plant) 125 air miles from Charlotte. The proposed location of the second EOF at the Oconee Plant, which is the subject of this proceeding, is admittedly not within the Commission's requirement that the second EOF shall be located no more than 20 miles from the plant site. To effectuate its plan for this second EOF at the Oconee Plant, Duke applied to the Commission to be exempted from this requirement and for the approval of the location of the second EOF 125 air miles from the plant.[1] The Commission denied the request and by their petition in this court Duke challenges that denial.

■ It is necessary at the outset of our consideration to determine the proper standard for review of the Commission's action. The parties agree that, in passing on Duke's exemption request, the Commission was engaged in informal agency adjudication, under which it was authorized to proceed on the basis of an informal hearing in which it may consider written materials, including factual and legal statements, without holding a formal hearing with traditional trial-type procedures. *See, West Chicago v. NRC,* 701 F.2d 632, 638 (7th Cir.1983). Judicial review of a decision of the Commission in such a proceeding is governed by section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), which requires a reviewing court to set aside agency action if it appears in the record that such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Under this standard, however, a reviewing court is not to substitute its judgment for that of the agency, and the court

---

**1.** The Oconee plant is located almost on the border of South Carolina and Georgia and the main headquarters of Duke is located at Char-

lotte, North Carolina, some twenty miles north of the South Carolina line.

is to show a proper deference to the expertise of the agency. The court should make a "searching and careful" inquiry of the record in order to ascertain whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

But, in applying these principles, we must not lose sight of the unique nature of the problem of nuclear safety. As the Court said in *Rockland v. NRC,* 709 F.2d 766, 768 (2d Cir.1983):

> One of the most emotional issues confronting our society today is the adequacy of safety measures at nuclear power facilities. Fueled by the Three Mile Island incident, the debate over nuclear safety persists as public interest groups charge that serious problems remain and operator-utilities seek to assure the public that all reasonable measures have been taken to protect surrounding populations in the event of a major nuclear accident. But it is the United States Nuclear Regulatory Commission ... which must decide the difficult questions concerning nuclear power safety.

Because of the unique nature of this problem, it has been well said that "broad responsibility is reposed in the administrative agency [i.e., the Commission], free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives." *North Anna Environmental Coalition v. NRC,* 533 F.2d 655, 659 (D.C.Cir. 1976) (quoting *Siegel v. Atomic Energy Commission,* 400 F.2d 778, 783 (D.C.App. 1968).

It is the position of Duke that, despite the "broad responsibility" vested in the Commission in the field of nuclear safety, the denial of its petition herein was "arbitrary," "capricious" and an "abuse of discretion" as demonstrated by its failure to afford a "hard look" to the pertinent facts it submitted in support of its petition and by the inconsistency in other decisions of the Commission. The Commission's re-

sponse is that its staff gave Duke three hearings and received its oral presentations, its written arguments, and various slides submitted by it. All the arguments of Duke appear to have been thoroughly canvassed in these hearings. Minutes of these meetings, including the "salient" points advanced by Duke are included in the record. It is clear, too, that the staff made clear to Duke its position, which was incorporated in its recommendations to the Commission later available to Duke. In proceeding on the basis of these hearings, with the summarization of the extensive presentations by Duke, as well as of the specific recommendations of the staff, the Commission, even though it adopted the reasoning of the staff in reaching its decision, committed no error. *See Colorado Interstate Gas. Co. v. Federal Power Commission,* 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945).

Duke's argument that the staff did not take a "hard look" at all the reasons suggested by it (Duke) in support of its petition for an exemption is similarly refuted by the record. The staff was not perfunctory in its review of the petitioner's application. Nor does Duke contend that it was denied the right to make a full presentation of its views. The record amply shows that the presentations made by Duke before the staff were adequately summarized in the summaries of such presentations furnished the Commission for its guidance in evaluating Duke's application. The staff, in its recommendations, differed with Duke's contentions. There is little doubt that, based on their experience in connection with the Three Mile Island disaster, as well as on their own expertise, the staff felt that the opportunity for face-to-face co-operation and co-ordination between on-site and off-site personnel in an emergency was the better procedure. And this view was accepted by the Commission. Nor was this view one made only in this connection. The Commission has expounded this view in other proceedings. Thus, in its decision in *Metropolitan Edison Com-*

*pany,* 18 NRC 299, 308 (1983), the Commission said:

> [T]he EOF is the ideal place for face-to-face communications regarding protective action recommendations between Federal, State and local officials, and the Licensee official charged with making the recommendations to the Commonwealth. The Commission does not believe, as Licensee suggests, that telephonic communications between the governmental officials in the EOF and the Licensee's decision-maker in the control room provide an equivalent opportunity for an exchange of information. The Commission views the opportunity for face-to-face communications as the best means to exchange pertinent information between government officials and the Licensee and to formulate protective action recommendations, particularly when it is essential that there not be misunderstandings between those involved.

Of course, Duke has marshalled a number of reasons for a contrary conclusion to that of the Commission. But they were all considered by the Commission and its staff, and there is nothing to indicate that such consideration was flawed other than that it did not agree with Duke's argument. Even were we to assume that there was merit in some of Duke's reasoning, it is not for us to set aside the Commission's decision when the Commission has given a reasoned explanation for its contrary position. This is not a case where the agency has not given a "hard look" at Duke's reasoning; it is simply a case where the Commission has, for reasons which we cannot say are irrational, not agreed with the petitioner. To give a "hard look" to a party's position does not mean that the agency must agree with the party's position.

■ The inconsistency in judgment argument of Duke is based only on an early decision in connection with the Tennessee Valley Authority's EOF. However, it is evident in the record that this decision was discussed at some length during the informal hearings with the staff. The TVA decision was rendered in 1981 while the Commission was in the formative stages of devising its rules for off-site safety procedures in the event of an emergency. Since that time, as the discussion between Duke's representatives and the Commission staff indicated, the TVA has recognized as a result of emergency exercises that "a problem area identified is NRO Site Team interface." Letter from Duke Power Co. to Harold Denton, Director of NRC (June 3, 1983) (requesting exemption from EOF site requirements). On the face of this demonstration of a problem created by the absence of "interface" between on-site and off-site personnel during an emergency, it is understandable that the Commission did not wish to approve an EOF located farther from the site of the nuclear plant than the EOF for the TVA's Brown's Ferry facility.

■ To put the matter briefly: We are unwilling to substitute our judgment in a matter as arcane as nuclear safety, where there may be good reasons on both sides of the argument, for that of the agency with both the responsibility and the expertise in the field.

The petition for review and vacation of the decision of the Commission is denied.