**Roy C. BERG, Plaintiff,**

v.

**COMMANDER, FIFTH COAST GUARD DISTRICT, Defendant.**

**Civ. A. No. 3:92CV193.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Dec. 31, 1992.

Supplemental Memorandum Opinion
and Order Jan. 20, 1993.

Thomas Henry Oxenham, III, Oxenham, Rohde & Oxenham, Richmond, VA, for Roy C. Berg, Jr.

Robert William Jaspen, U.S. Atty.'s Office, Richmond, VA, for Commander, Fifth Coast Guard Dist.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

Roy C. Berg ("Berg") filed this action to secure judicial review and reversal of a decision to disenroll him from the United States Coast Guard Auxiliary (the "Auxiliary"). Berg contends that the disenrollment presents a federal question within the meaning of 28 U.S.C. § 1331, and that the scope of review is prescribed by the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Specifically, Berg contends that the decision violated his Fifth Amendment due process rights and hence is reviewable under 5 U.S.C. § 706(2)(B). Alternatively, Berg challenges the administrative decision as arbitrary, capricious, an abuse of discre-

tion and otherwise not in accordance with law, and hence seeks review also under 5 U.S.C. § 706(2)(A). Finally, Berg asserts that a trial *de novo* is warranted under 5 U.S.C. § 706(2)(F).[1]

The defendant, Commander of the Fifth Coast Guard District (the "Commander"), has moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) or, alternatively, for summary judgment under Fed.R.Civ.P. 56. The Commander's pleadings raise matters beyond the complaint and hence must be treated as a motion for summary judgment. Fed.R.Civ.P. 12(b).

For the reasons explained below, the Commander's motion for summary judgment on Berg's due process claim is granted; the remainder of the Commander's motion for summary judgment is denied; Berg's motion for trial *de novo* is denied; and the court will review Berg's disenrollment under 5 U.S.C. § 706(2)(A).

### Statement of Facts

Berg joined the Auxiliary in April 1985. The Auxiliary is a non-military organization administered by the Commandant of the United States Coast Guard (the "Coast Guard"). *See* 14 U.S.C. § 821. The members of the Auxiliary are non-salaried civilian volunteers. The purposes of the Auxiliary are:

(a) to promote safety and to effect rescues on and over the high seas and on navigable waters;

(b) to promote efficiency in the operation of motorboats and yachts;

(c) to foster a wider knowledge of, and better compliance with, the laws, rules, and regulations governing the operation of motorboats and yachts; and

(d) to facilitate other operations of the Coast Guard.

14 U.S.C. § 822. Membership in the Auxiliary is open to owners of boats, aircraft and radio stations, and to other individuals whose special training or experience would qualify them for duty in the organization. 14 U.S.C. § 823. The Commandant of the Coast Guard has issued an Auxiliary Manual (the "Manual"), COMDTINST M16790.-1C, which applies to "all members of the Auxiliary and all active duty personnel involved in Auxiliary administration."

The Auxiliary is divided into ten geographic districts. The Commonwealth of Virginia is located in the Fifth District. The Fifth District is subdivided into the Northern Region and the Southern Region. There are approximately 3800 members in the Fifth Southern Region. Each Region is further subdivided into smaller units called Flotilla. When Berg joined the Auxiliary in April 1985, he became a member of Auxiliary Flotilla 38, Fifth Southern Region. From June 1990, until his disenrollment on February 21, 1992, Berg was a member of Auxiliary Flotilla 31, Fifth Southern Region.

Each Auxiliary unit has its own civilian "officer" structure,[2] but the Auxiliary actually operates under the formal direction of the military staff of the Coast Guard. Each Auxiliary region is headed by a Director of Auxiliary, who is a commissioned officer on active duty in the Coast Guard. From July 1991 through May 1992, the Director of Auxiliary for the Fifth Southern Region was Lieutenant Willie M. DuPriest. Lieutenant DuPriest's supervisor at all times relevant to this action was Captain Robert A. Melvin, III, Chief of the Fifth District's Boating Safety Division. Captain Melvin also served as the Director of Auxiliary for the Fifth Coast Guard District. From June 1991 through April 1992, Captain Melvin's immediate supervisor was Captain (now Rear Admiral) Roger J. Rufe who, at the time, was the Fifth District's Chief of Staff and the second highest ranking Coast Guard officer assigned to the Fifth District. Since July 1991, the District Commander of the Fifth

---

1. Berg's complaint also alleged that the decision was unsupported by substantial evidence and contended that the decision was reviewable under 5 U.S.C. § 706(2)(E), but he abandoned that position at oral argument.

2. The civilian officers are elected by their fellow civilian volunteer members of the Auxiliary. *See generally* Auxiliary Manual, Chapter 4 (exhibit 1 to *Brief in Support of Defendant's Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment*).

Coast Guard District has been Rear Admiral Walter T. Leland.

In late 1989, several fellow members of the Auxiliary refused to certify Berg as a Courtesy Marine Examiner and vessel operator. Berg protested this decision to the Director of the Auxiliary who had the matter investigated. Subsequently, Berg was qualified as a Courtesy Marine Examiner and vessel operator. Berg alleges that the fact that he received his qualifications did not sit well with other members of his Flotilla and that some of them made harassing phone calls to him and that others defamed him with accusations of misconduct. Berg successfully prosecuted two defamation suits in state court as a result of these incidents.

The Commander contends, and the record reflects, that Berg made repeated demands that the Coast Guard take disciplinary action against several members of the Auxiliary because of these incidents. Ultimately, one member of the Auxiliary against whom Berg had lodged complaints was disenrolled for cause. However, Berg's complaints against the other members of the Auxiliary were found to be without merit.

The Coast Guard's decision declining to take further action on the complaints apparently did not sit well with Berg because it touched off a series of hostile letters and telephone calls from Berg to Lieutenant DuPriest. The record before the court is replete with correspondence from Berg containing accusations of conspiracy, discrimination and favoritism within the ranks of the Auxiliary. The record also reflects that Berg made numerous telephone calls of the same ilk to Coast Guard officials. On December 4, 1991, Lieutenant DuPriest informed Berg that his conduct had become an administrative burden on the Coast Guard and instructed Berg to cease it. Berg responded on December 5, 1991 with a vituperative sixteen page letter in which he withdrew from active participation in the Auxiliary.

On December 20, 1991, Lieutenant DuPriest notified Berg of his intent to recommend that Berg be disenrolled from the Auxiliary. The notice explained that Berg had ignored the December 4 warning and had continued to make oral and written demands and threats in an insulting and discourteous manner. Berg's letter dated December 5, 1991 and an undated letter received on December 20, 1991, were characterized by Lieutenant DuPriest as evidencing a "rude, sarcastic, demeaning tone and content" which was "prejudicial to the good order of the Auxiliary." Berg also was cited as having created an administrative burden upon the military staff of the Coast Guard. The notice advised that the disenrollment would be "for cause" and accorded Berg thirty days to submit a statement concerning the proposed disenrollment.

By letter dated December 23, 1991, Berg's counsel asked the Coast Guard to defer action upon the disenrollment recommendation until after January 2, 1992 because Berg was at that time previously committed to the prosecution of lawsuits underway in state court. In response to this request the Coast Guard extended the deadline for submission of Berg's statement until February 10, 1992, and before that date Berg submitted his position statement and supporting materials.

On February 10, 1992, Lieutenant DuPriest forwarded a letter to Captain Rufe through Captain Melvin, in which Lieutenant DuPriest recommended that Berg be disenrolled from the Auxiliary. There were numerous accompanying documents, including Berg's written position on the proposed disenrollment and all correspondence on that subject from Berg's counsel. Captain Melvin agreed that Berg should be disenrolled from the Auxiliary and so recommended to Captain Rufe. Captain Melvin's concurrence in the recommended disenrollment explained that the demands placed on Lieutenant DuPriest's time by Berg had impaired Lieutenant DuPriest's ability to serve the other 3800 Auxiliary members in the Fifth District's Southern Region. Captain Melvin also commented that Berg's continuous accusations against other Auxiliary members had caused damage to the Auxiliary because it had caused members to leave the Auxiliary and had

left the remaining senior Auxiliary leaders feeling helpless to deal with the ongoing conflict. In Captain Melvin's judgment, Berg had prejudiced good order in the Auxiliary by engaging in "threatening, demanding, insulting, and otherwise disrespectful behavior towards commissioned Coast Guard officers." This too was thought to contribute to the findings of cause warranting Berg's disenrollment.

On February 14, 1992, Captain Rufe decided that there was cause to disenroll Berg from the Auxiliary. By letter dated February 21, 1992, Lieutenant DuPriest advised Berg's counsel of that decision. Berg appealed the disenrollment decision to the District Commander, Rear Admiral Leland, who denied it on March 13, 1992. This litigation followed.

The Standard for Summary Judgment

 Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In considering a motion for summary judgment the court is not to weigh the evidence, but rather must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In so doing, the court must view the underlying facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

 The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,'" that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1338–39 (4th Cir.1992). Once this initial showing under Rule 56(c) is made, the burden of production, not persuasion, shifts to the non-moving party. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e); *Catawba Indian Tribe*, 978 F.2d at 1338–39.

In meeting this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. That party must demonstrate that there is a *"genuine issue for trial."* Fed.R.Civ.P. 56(c) (emphasis added); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. *See also Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

Discussion

I. *Jurisdiction*

 Berg asserts that jurisdiction in this court is proper under 28 U.S.C. § 1331 and 5 U.S.C. § 701, *et seq.* The allegations of the complaint focus principally upon the Administrative Procedure Act which, of course, "does not itself afford a grant of subject matter jurisdiction permitting judicial review of agency action." *Hostetter v. U.S.*, 739 F.2d 983, 985 (4th Cir.1984) (citing *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977)). However, 28 U.S.C. § 1331 vests in district courts jurisdiction over challenges to reviewable federal agency actions taken under federal law or regulation, and the Administrative Procedure Act provides the method and scope of review unless a statute expressly precludes review. *Id.* *Accord Parola v. Weinberger*, 848 F.2d 956, 958 (9th Cir.1988); *Robbins v. Reagan*, 780 F.2d 37, 42 (D.C.Cir.1985). *See also* 4 K. Davis, *Administrative Law Treatise* § 23:3, pp. 128–29 (2d ed. 1983) ("A case brought by a plaintiff who seeks review of reviewable action of a federal agency is a

civil action arising under the Constitution, law or treaties of the United States, and such a case may be brought in a district court under § 1331 unless some other statute is interpreted to withdraw the jurisdiction that § 1331 confers.").

Berg's complaint expressly invokes 28 U.S.C. § 1331 as a basis for jurisdiction, but it does not expressly identify the federal law which activates the jurisdictional grant conferred by 28 U.S.C. § 1331. However, upon review of the complaint, the Manual which is cited therein and the statute under which the Manual was promulgated, and considering that the subsequent pleadings filed by the parties consider the issues presented by the complaint to arise under federal statute and regulation, the court finds that the complaint establishes federal question jurisdiction arising from the federal statute creating the Auxiliary and the Manual by which the disenrollment proceeding were conducted.[3] As discussed below in Section II, the court finds that judicial review of Berg's disenrollment is not expressly precluded by statute. Accordingly, there is federal question jurisdiction to review Berg's disenrollment in the fashion and to the extent permitted by the Administrative Procedure Act.

## II. *Judicial Review Pursuant To The Administrative Procedure Act Is Not Precluded By Statute*

The Commander asserts that judicial review of Berg's disenrollment is precluded by 5 U.S.C. § 701(a)(1)[4] or, alternatively, by 5 U.S.C. § 701(a)(2).[5]

■ 5 U.S.C. § 701(a)(1) provides that the Administrative Procedure Act does not apply when other "statutes preclude judicial review." The Commander contends that judicial review is precluded here because 14 U.S.C. § 893 does not specifically

confer a right to judicial review of a decision to disenroll a member of the Auxiliary. In pertinent part, 14 U.S.C. § 893 provides:

Members of the Auxiliary and temporary members of the Reserve shall be entitled only to such rights, privileges and benefits as are specifically set forth for them in this title or as may be specifically provided for them in any other Act of Congress.

The verb "preclude" means "to shut out or obviate by anticipation: prevent or hinder by necessary consequence or implication: deter action of, access to, or enjoyment of." Webster's Third New International Dictionary (1986). The decisions interpreting Section 701(a)(1) teach that there is a presumption in favor of judicial review and that preclusion may be found only by clear expression of legislative intent. *See, e.g., Heckler v. Chaney*, 470 U.S. 821, 826, 105 S.Ct. 1649, 1653, 84 L.Ed.2d 714 (1985) ("there is a general presumption that all agency actions are reviewable under the APA," at least under the arbitrary, capricious or abuse of discretion standard); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) (legislative intent to restrict access to judicial review must be shown by clear and convincing evidence). It is true that title 14 does not specifically grant Auxiliary members a right of judicial review of decisions disenrolling them for cause from the Auxiliary. However, taking the foregoing legal principles into account and giving "preclude" its usual and ordinary meaning, it cannot be said that 14 U.S.C. § 893 or any other provision of title 14 precludes judicial review of a disenrollment decision.

■ Alternatively, the Commander argues that Berg's disenrollment is unreviewable under 5 U.S.C. § 701(a)(2) because di-

---

**3.** Berg's constitutional arguments appear to have been spawned at the briefing stage and do not appear on the face of the complaint. However, the government and Berg appear to consider Berg's constitutional claims to be reviewable. Hence the court, having found jurisdiction, will resolve them.

**4.** Section 701(a)(1) provides:

This chapter [the APA] applies, according to the provisions thereof, except to the extent that—1) statutes preclude judicial review.

**5.** Section 701(a)(2) provides:

This chapter [the APA] applies, according to the provisions thereof, except to the extent that—2) agency action is committed to agency discretion by law.

senrollment is a decision "committed to. agency discretion by law." Section 701(a)(2) forecloses judicial review under the Administrative Procedure Act in cases where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. at 830, 105 S.Ct. at 1655. Under 14 U.S.C. § 633, the Coast Guard is empowered to issue regulations governing the operation of the Auxiliary. That authority was used to enact the rules and regulations set forth in 33 C.F.R. Part 5, § 5.01, *et seq.*

33 C.F.R. § 5.17 provides that a member of the Auxiliary can be disenrolled "for cause." A disenrollment for cause necessarily calls for the exercise of discretion on the part of the decision-maker. In exercising this discretion, the reasons given by the Coast Guard for Berg's disenrollment were that he was "an administrative burden" to the Coast Guard and that his conduct was "prejudicial to the good order of the Auxiliary." The court finds that cause, a concept not at all foreign to review of administrative action, is the standard by which the Coast Guard's exercise of discretion may be judged. The Coast Guard's reasons for disenrolling Berg can be measured against that standard upon a review of the administrative record. Accordingly, 5 U.S.C. § 701(a)(2) does not foreclose judicial review of the Coast Guard's decision to disenroll Berg.

### III. *Berg's Due Process Claim*

Berg contends that the disenrollment violated his Fifth Amendment due process rights in three ways, and hence is reviewable under 5 U.S.C. § 706(2)(B).[6] First, Berg alleges that the notice of disenrollment was constitutionally defective because it did not properly inform of the charges against him. Second, Berg contends that the disenrollment procedure was constitutionally defective because it did not afford him an evidentiary hearing before, or alternatively after, disenrollment. Fi-

nally, Berg alleges that he was deprived of due process because the decision-makers were biased against him.

The Commander has moved for summary judgment on Berg's due process claims on the ground that Berg's status as a volunteer member of the Auxiliary was insufficient to confer upon him a liberty or property interest cognizable under the Fifth Amendment. This, of course, is the threshold issue in any due process claim. *See, e.g., Harrison v. U.S. Postal Service,* 840 F.2d 1149, 1152 (4th Cir.1988) (in analyzing a due process claim the first question is whether plaintiff has a liberty or property interest).

■ It is settled that procedural due process must accompany the deprivation of constitutionally protected liberty and property interests. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). *See also Jenkins v. Weatherholtz,* 909 F.2d 105, 107 (4th Cir. 1990). This is true whether a plaintiff alleges that a state actor violated due process rights secured by the Fourteenth Amendment, or where, as here, the allegation is that the plaintiff's due process rights under the Fifth Amendment were violated by the federal government. *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) ("procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth *or* Fourteenth Amendment") (emphasis added).

■ It is likewise clear that the government may not deprive a person of constitutionally guaranteed liberty and property interests without constitutionally adequate procedures. *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). However, where governmental actions adversely affect an individual but do not constitute

---

**6.** Section 706(2)(B) provides:
The reviewing court shall—(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(B) contrary to constitutional right, power, privilege, or immunity.

denial of a constitutionally protected liberty or property interest, the government is not required by the Constitution to afford the affected person any hearing or due process whatsoever. R. Rotunda & J. Nowak, *Treatise on Constitutional Law*, § 17.2, at p. 581 (2d Ed.1992). Accordingly, it is necessary to ascertain the nature and extent of the interest which Berg claims to have lost upon disenrollment and then to determine whether that interest is entitled to constitutional protection.

### A. Berg's Alleged Liberty Interest

■ Relying on the decisions of Supreme Court of the United States in *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), and *Bd. of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987), Berg contends that his First Amendment liberty interest in freedom of association has been violated. Berg's reliance on *Roberts* and *Rotary Club* is misplaced.

In *Rotary Club*, the Supreme Court explained:

> [The] cases have afforded constitutional protection to freedom of association in two distinct cases. First, the Court has held that the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the Court has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities.

481 U.S. at 544, 107 S.Ct. at 1945. The types of relationships which have been afforded constitutional protection include marriage, *see Zablocki v. Redhail*, 434 U.S. 374, 383–386, 98 S.Ct. 673, 679–81, 54 L.Ed.2d 618 (1978), the begetting and bearing of children, *see Carey v. Population Services International*, 431 U.S. 678, 684–86, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1977), child rearing and education, *see Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925), and cohabitation with relatives, *see*

*Moore v. East Cleveland*, 431 U.S. 494, 503–04, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977). The Supreme Court has emphasized "that the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.' " *Rotary Club*, 481 U.S. at 545, 107 S.Ct. at 1945 (citing *Roberts*, 468 U.S. 609–619–620, 104 S.Ct. 3244–3250–3251, 82 L.Ed.2d 462 (1984)).

Factors to be considered in determining whether a particular relationship or association is sufficiently personal or private to warrant constitutional protection are "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." *Id.* 481 U.S. at 546, 107 S.Ct. at 1946. Applying this analysis to the facts in this action, it is clear that Berg's membership in the Auxiliary is not the type of intimate or private relationship which warrants constitutional protection. In *Rotary Club*, the Supreme Court intimated that an organization whose membership ranged "from fewer than 20 to more than 900" was too large to suggest the kind of private or personal relationship protected by the First Amendment. *Id.* at 546–47, 107 S.Ct. at 1946. Also in *Rotary Club*, there were no upper limits on membership in the organization. Berg is one of 3800 members of the Fifth Southern Auxiliary Region. There are no upper limits on membership in the Auxiliary, the Fifth Southern Region, or even in individual Flotilla. As was the case in *Rotary Club*, the Auxiliary's purpose is more accurately described as public, rather than private or personal. *See* 14 U.S.C. § 822.[7] Moreover, membership in the Auxiliary is not particularly selective. The Auxiliary Manual states that "membership is open to citizens of the United States and its territories and possessions, 17 years or older, who either

7. *See* footnote 1, *supra*.

own a facility [8] or have special training or experience to qualify for Auxiliary membership. Auxiliary membership is also open to members of the uniformed services and their reserve components." Auxiliary Manual, § 3.A.1. Finally, it is apparent from several of the exhibits submitted by the parties that non-members of the Auxiliary are invited to attend Auxiliary meetings and are active participants in the Auxiliary's day-to-day operations. In sum, membership in the Auxiliary is far from the type of personal or private relationship which is entitled to constitutional protection.

■■■ Nor can it be said that disenrollment affected Berg's freedom of association "for the purpose of engaging in protected speech or religious activities." *Rotary Club*, 481 U.S. at 544, 107 S.Ct. at 1945. Berg does not contend that he joined the Auxiliary to participate either in protected speech or in religious activities. In fact, Berg does not even argue that either activity is among those in which the Auxiliary customarily engages. Accordingly, Berg has failed to establish that he had a constitutionally cognizable liberty interest in continued membership in the Auxiliary.

B. Berg's Alleged Property Interest

■■■ Berg contends that the disenrollment deprived him of three benefits which he claims are property interests: (1) the ability to make purchases at Coast Guard Exchanges; [9] (2) the ability to display the Auxiliary "wreath" (decal) on his boat, which in turn exempted him from paying the Virginia Recreational Vessel Fee; and (3) the ability to receive workers compensation and death benefits for injury or death in the line of duty.[10] The court finds, however, that with the possible exception of the ability to make purchases at Coast Guard Exchanges, Berg voluntarily gave up his benefits by virtue of three letters he submitted to the Auxiliary in 1989 and 1991.

In November 1989, Berg sent a letter through his chain of command to the Commodore of the Fifth District captioned "RESIGNATION EFFECTIVE IMMEDIATE." In this letter Berg wrote: "I submit my resignation to the Coast Guard Auxiliary. I find that I no longer have the spirit and enthusiasm to continue on with the program." (See Defendant's Exhibit 100). Berg also withdrew his boat, camper, services as a Courtesy Marine Examiner, and "help during classes" from use by the Auxiliary.

On March 18, 1991, Berg once again submitted a letter of resignation from the Auxiliary. (*See* Defendant's Exhibit 77). In this letter Berg wrote, "please accept my resignation from the Coast Guard Auxiliary with deep regreat [sic]. I request that my resignation become effective immediately."

Berg changed his mind again and withdrew his resignation, but in the sixteen page letter he sent to Lieutenant DuPriest on December 5, 1991, he also stated:

I must withdraw immediately from my following Flotilla positions:

1. Flotilla Communications Officer
2. Flotilla Operations Officer
3. Temporary Vessel Examiner Officer

I also must immediately withdraw my offer of use:

1. Land Base Radio System
2. Emergency Service Vehicle and Mobile Radio
3. Operation Vessel Facility VA–8321–MM

I also immediately withdraw from all patrole [sic] operations, courtesy safety boths [sic] and as a Coast Guard Auxiliary instructor.... For I will not resign but I will use any and all of my resources in and out of the Coast Guard and Coast Guard Auxiliary to prevent this kind of harassment....

---

**8.** The Auxiliary Manual defines a "facility" as "a privately-owned boat, yacht, aircraft, fixed land or land mobile radio station, at least 25% of which is owned by the Auxiliarist." Auxiliary Manual, § 3.A.2.

**9.** *See generally* Auxiliary Manual § 3.B.1.b.

**10.** *See generally* Auxiliary Manual § 5.L.1.

Berg received a response from Lieutenant DuPriest dated December 20, 1991 which: (1) accepted Berg's resignation from his appointed Flotilla positions; and (2) acknowledged Berg's withdrawal of his offer to use his facilities. Significantly, Lieutenant DuPriest wrote:

> Please remove the facilities decal and operational wreath and forward them directly to this office. You need not forward them through your chain of communications. You cannot use the facilities for Auxiliary activities without submitting a new offer for use and my acceptance of that offer. I remind you that your vessel is subject to the Recreational Vessel Fee and you should obtain a RVF decal at your earliest opportunity. . . .

(*See* Defendant's Exhibit 16).

This correspondence makes it clear that Berg voluntarily relinquished two of the benefits upon which he now predicates his claimed property interest. As a consequence of his December 5, 1991 letter, Berg was no longer entitled to display the Auxiliary wreath on his boat or to the exemption from the Virginia Recreational Vessel Fee. Moreover, when Berg withdrew from participation in the activities of the Auxiliary, he eliminated even the possibility that he might be entitled to workers compensation and death benefits. Accordingly, the only claimed benefit conceptually available to Berg at the time of disenrollment was the ability to make purchases at Coast Guard Exchanges. It is not at all clear that this benefit, if indeed Berg was entitled to it, would be sufficient to constitute a constitutionally cognizable property interest.

The Coast Guard's pleadings are ambivalent about whether Berg even had the benefit of purchasing at Coast Guard Exchanges following the letter of December 5, 1991. In light of that ambivalence, Berg's pleadings in opposition to summary judgment create a factual dispute on that issue. Accordingly, the Commander's motion for summary judgment on Berg's claim of an alleged deprivation of his property interest must be denied unless, as a

matter of law, Berg received that degree of due process which he was due respecting the deprivation of this benefit. We turn next to consideration of that question.

Some form of hearing is constitutionally required before an individual is finally deprived of a liberty or property interest. *Mathews v. Eldridge*, 424 U.S. at 333, 96 S.Ct. at 902. Due process is not, however, a rigid standard. The question of whether the requirements of due process have been met must be resolved on a case-by-case basis because "resolution of the issue whether administrative procedures [in any given case] are constitutionally sufficient requires analysis of the governmental and private interests that are affected." *Id.* at 334, 96 S.Ct. at 902 (citations omitted).

In *Mathews*, the Court identified three factors to consider in determining whether the requirements of due process have been met:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal or administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903. Examination of Berg's disenrollment in light of these factors makes it clear that Berg received all the due process to which he was entitled.

As explained above, the private interest, if any, at stake here is the right to purchase goods at Coast Guard Exchanges (which sell goods generally at prices lower than available in most of the private sector). Assuming, without deciding, that this benefit rises to the level of a protected property interest, we turn now to an assessment of the level of protection due that interest.

In *Mathews*, the Court explained that "the essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" 424 U.S.

319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976) (citation omitted). *Accord Riccio v. County of Fairfax,* 907 F.2d 1459, 1463 (4th Cir.1990) (inquiry must focus on whether plaintiff received oral or written notice of the charges against him, an explanation of the evidence against him, and an opportunity to present his side of the story before termination.). It is undisputed that Berg received notice of his pending disenrollment. However, Berg contends that the notice which he received was constitutionally inadequate because it did not properly inform him of the nature of the charges against him.

The record shows that this contention is without merit. The Notice of Disenrollment, dated December 20, 1991 stated:

1. On October 16, 1991, you were given a written warning to cease being an administrative burden on the Coast Guard. On December 2 and 4, you continued to call and make demands and threats on the phone. In addition, you became insulting and discourteous. On December 4, 1991, you were warned again about this conduct and you were restricted to written communications because of your insulting behavior on the telephone.

2. You ignored these warnings. The rude, sarcastic, demeaning tone and content of your letter dated 5 Dec 91 and your undated letter titled "Subject your letter 4 Dec 1991 false and misleading statements" are totally unacceptable.

3. This behavior is prejudicial to the good order of the Auxiliary. Also, the letters you sent constitute the administrative burden about which you were warned. Because of your repeated misconduct, you are being recommended to the District Chief of Staff for disenrollment for cause.

4. The Auxiliary Manual states that you may submit a statement concerning your pending disenrollment. You have 30 days to submit it.

This notice clearly informed Berg that he was charged with being an "administrative burden" and with conduct "prejudicial to the good order of the Auxiliary." The notice, whether considered alone or together with Berg's undeniable personal knowledge of the contents of the letters he had written and the telephone calls he had made to the Coast Guard's Auxiliary Command, was clearly sufficient to inform him of the nature of the charges against him.

Berg was also given opportunity to present his side of the story before he was disenrolled. Pursuant to Auxiliary Manual § 3.E.3.(1), Berg was given thirty days from the date of the Notice of Disenrollment to submit a written statement explaining why he should not be disenrolled. This statement was included in the record which was then transmitted to higher authorities for a decision on the recommendation that Berg be disenrolled.

Berg contends that this procedure was constitutionally infirm because it did not provide for an evidentiary hearing before disenrollment. The constitution requires a pre-deprivation hearing only in those cases in which "the very means by which to live" are implicated. *See Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The Supreme Court has "consistently recognized that ... the interest of a government employee in retaining his job can be summarily denied," provided some form of post-deprivation hearing is available. *Cafeteria Workers v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961). *Cf. Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985) (to require more than notice and an opportunity to respond prior to termination would intrude to an unwarranted extent on the government's interest in removing an unsatisfactory employee). Considering that it is not necessary to provide a government employee with a hearing before termination of employment, Berg's argument that he was entitled to an evidentiary hearing before being deprived of his volunteer status (and the corresponding ability to make purchases at Coast Guard Exchanges, which was the only interest he retained in Auxiliary membership) is clearly without merit.

"[T]he Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interest." *Cafeteria Workers*, 367 U.S. at 894, 81 S.Ct. at 1748. Moreover, it is clear that "the judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decision-making in all circumstances." *Mathews v. Eldridge*, 424 U.S. at 348, 96 S.Ct. at 909. As Professor Davis explains in his *Administrative Law Treatise:*

> The main reason *for* a trial-type hearing—to provide procedural fairness by allowing a party a chance to rebut or explain adverse facts before deciding against him—may be offset or more than offset by the reasons *against* allowing such a hearing. When the interest at stake is large, the disadvantage from allowing a hearing is almost always smaller. When the interest at stake is small, and especially when it is trifling, trial procedure is often too cumbersome or too inconvenient.

2 K. Davis, *Administrative Law Treatise* § 12:15, at pp. 463–64 (2d ed. 1979) (emphasis in original).

The court finds that the procedures followed by the Coast Guard pursuant to § 3.E. of the Auxiliary Manual, which included pre- and post-deprivation opportunities for Berg to submit written reasons and evidence in support of his side of the story, were more than adequate to guard against the possibility of erroneous deprivation of Berg's interest.[11] Berg has identified no substantial value in additional or substitute procedural safeguards. Finally, in light of the minimal interest implicated by Berg's disenrollment, to require the Coast Guard to hold a full-blown evidentiary hearing would be an unreasonable burden upon the military personnel charged with administering the Auxiliary.

In sum, the court finds that, even if Berg had a property interest in continued membership in the Auxiliary, the disenrollment process satisfied the requirements of due process.

 Berg also alleges that his due process rights were violated because he was denied impartial and unbiased decisionmakers. The bases for this argument are that: (1) Lieutenant DuPriest, with whom Berg had several clashes, initiated the charges against him; and (2) Captain Cain, the district legal officer who provided advice to Admiral Leland regarding Berg's appeal, had himself been accused of misconduct by Berg. These allegations are insufficient to raise an inference that Berg was denied an impartial decision-maker.

First, Lieutenant DuPriest simply did not act in the role of a decision-maker. Pursuant to Auxiliary Manual § 3.E.3(k), Lieutenant DuPriest, as the Director of Auxiliary for the Fifth Southern Region, had the authority to initiate the disenrollment action by *recommending* that Berg be disenrolled. However, the Chief of the Boating Safety Division or the District Chief of Staff had to approve or reject that recommendation. Thus, Lieutenant DuPriest's role was to initiate the disenrollment process, not to decide whether disenrollment should occur. Berg cites, and the court has found, no authority which would require impartiality on the part of one who initiates disciplinary or termination proceedings.

Captain Cain provided legal advice to Admiral Leland, the ultimate decision-maker in the process which culminated Berg's disenrollment. By letter dated March 3, 1992, Captain Cain informed Admiral Leland of Berg's allegations against him. He wrote:

> Before going any further, I want to draw your attention to enclosure (2) which is a February 2, 1992 letter to you from Mr. Berg. Please note that in enclosure (2) Mr. Berg has accused me of wrongdoing

---

**11.** Cases such as *U.S. v. Allegheny–Ludlum Steel Corp.*, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972), and *U.S. v. Florida East Coast R. Co.*, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), hold that an opportunity to submit written materials to the decision-maker is a constitutionally adequate substitute for oral hearings. Hence Berg had a "hearing" in that he had a chance to know the reasons for his proposed disenrollment and an opportunity to respond in writing twice to the charges against him.

in connection with his affairs. I contend that Mr. Berg's allegations against me are factually and legally erroneous. I do not know Mr. Berg and have no interest in his affairs other than as to official matters in which my official advice has been sought. Nevertheless, the fact that he has accused me of misconduct should be considered by you when you are deciding whether or not to accept my advice to you on this appeal.

Berg points to no specific facts which would lead to a conclusion that Captain Cain acted improperly, or even that Admiral Leland was in any way influenced by Captain Cain's alleged bias against Berg. Accordingly, Berg has failed to raise a genuine issue of material fact as to whether he was denied impartial decision-makers in his disenrollment. Hence, this prong of his due process claim also fails as a matter of law.

IV. *De Novo Review Under Section 706(2)(F)*

 Berg contends that he is entitled to *de novo* review of his disenrollment pursuant to 5 U.S.C. § 706(2)(F). The Administrative Procedure Act provides for *de novo* review under § 706(2)(F) only in very limited circumstances. *Acumenics Research & Technology v. Dept. of Justice*, 843 F.2d 800, 804 (4th Cir.1988). The Supreme Court of the United States has interpreted § 706(2)(F) as justifying *de novo* review in two situations: (1) "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate," and (2) "when issues that were not before the agency are raised in a proceeding to enforce non-adjudicatory agency action." *Id.* (Citing *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Neither situation is applicable in this case.

The decision to disenroll Berg was "adjudicatory in nature" and hence the question is whether the Coast Guard's factfinding procedures were inadequate. Berg's contention that the Coast Guard's factfinding procedures were inadequate is primarily based on the notions that: (1) he was not accorded an evidentiary hearing at which

he could confront and cross-examine his accusers; and (2) he was denied an unbiased decision-maker. For the reasons set forth fully above in assessing Berg's due process claims, the court finds that the Coast Guard's factfinding procedure was adequate. Accordingly, the court finds that Berg is not entitled to *de novo* review under § 706(2)(F).

V. *Review Under 5 U.S.C. § 706(2)(A)*

The decision to disenroll Berg was an agency decision, and Berg was a person adversely affected or aggrieved by that decision. The decision was taken under provisions of federal law and regulation. The court will therefore conduct judicial review of the disenrollment under the scope of review provided by 5 U.S.C. § 706(2)(A), which obligates the courts to set aside agency action if it was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

### Conclusion

For the foregoing reasons, the Commander's motion for summary judgment on Berg's due process claims is granted and the remainder of the Commander's motion for summary judgment is denied. Berg's motion for trial *de novo* is denied.

The Commander is directed to submit for review the entire administrative record that was before the Coast Guard at the time of Berg's disenrollment, or such parts of it as the parties agree should be reviewed. That submission shall be made not later than January 8, 1993.

By letter dated December 28, 1992, Berg's counsel asked that the court consider temporarily reinstating Berg pending final resolution of this action because Berg's certifications are at risk of expiration. The letter did not state an expiration date, and hence the court assumes that it is not immediately upon us. The court expects that review of the administrative record and final decision in this action will occur by January 31, 1993. In any event, the relief, having been requested merely by letter, is not presented in accord with proper procedure and will not be further considered.

The request for temporary reinstatement is denied without prejudice.

The Clerk is DIRECTED to send a copy of this Memorandum Opinion and Order to counsel for the parties.

It is so ORDERED.

## SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

By Memorandum Opinion and Order dated December 31, 1992, the court determined that the decision of the United States Coast Guard (the "Coast Guard") to disenroll Roy C. Berg ("Berg") from the United States Coast Guard Auxiliary (the "Auxiliary") would be reviewed pursuant to 5 U.S.C. § 706(2)(A) to determine whether it was arbitrary, capricious, an abuse of discretion or otherwise contrary to law. As instructed, the Coast Guard submitted the administrative record on which the disenrollment decision was made. Having carefully reviewed that record, the court concludes that the decision to disenroll Berg from the Auxiliary was not arbitrary, capricious, an abuse of discretion or otherwise contrary to law.

The pertinent background facts and procedural history are discussed in the Memorandum Opinion and Order dated December 31, 1992. In the interest of brevity, that part of the Memorandum Opinion and Order is incorporated by reference here.

### Discussion

The United States Court of Appeals for the Fourth Circuit recently explained the proper scope of judicial review under 5 U.S.C. § 706(2)(A):

In determining whether agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," ..., we perform "only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes," ..., and whether the agency has committed "a clear error of judgment." ... "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

*Maryland Dept. of Human Resources v. Dept. of Agriculture,* 976 F.2d 1462, 1475 (4th Cir.1992) (citing *Baltimore Gas & Elec. Co. v. NRDC, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983); *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and *Duke Power Co. v. NRC,* 770 F.2d 386, 390 (4th Cir.1985)). Moreover, the court "should make a 'searching and careful' inquiry of the record to ascertain whether the agency action 'was based on a consideration of the relevant factors....'" *Duke Power Co.,* 770 F.2d 386, 390 (4th Cir.1985) (citing *Citizens To Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24).

The reasons given by the Coast Guard for disenrolling Berg were: (1) that he had become an administrative burden to the Coast Guard; and (2) that he had engaged in behavior prejudicial to good order in the Auxiliary. If supported by the administrative record, these reasons would constitute cause for disenrollment as required by the applicable regulations.

The February 10, 1992, letter recommending that Berg be disenrolled for cause fully explains the reasons why Berg was considered an administrative burden, and each reason is supported by cited documentation. In like fashion, the letter explains why Berg's conduct was prejudicial to good order in the Auxiliary, and each reason given is likewise supported by cited documentation.

It would serve little purpose for the court to recount fully or in detail the entire contents of the administrative record. In sum, the record reflects that Berg became involved in numerous disputes with his fellow Auxiliarists and complained to the Coast Guard about their conduct. The Coast Guard investigated Berg's complaints, found some to be valid and others to be without merit, and ultimately disenrolled one Auxiliarist whose conduct was found to be particularly egregious. This, however, did not satisfy Berg and he initiated a campaign to reverse the Coast Guard's decision declining to take action against the other Auxiliarists who were

involved in the disputes with Berg. Having thoroughly reviewed Berg's positions when making its original decision, the Coast Guard refused to reverse course. Berg nonetheless persisted in his efforts by making telephone calls and sending letters to various Coast Guard officials and to outside officials, such as Virginia's two United States Senators. At the same time, Berg instituted civil litigation against the other Auxiliarists in the state court and thereafter sought to entangle the Coast Guard in that litigation. The Coast Guard justifiably resisted those efforts, and in response Berg stepped up his telephone and letter writing campaign.

As the frequency and length of Berg's telephone conversations and correspondence increased, officials of the Coast Guard were required to devote more and more time to dealing with Berg and the problems created by his conduct. This necessarily took time away from their other official responsibilities. Also, Berg displayed increasingly open hostility toward his fellow Auxiliarists and toward officials of the Coast Guard. The hostility soon turned into abuse, threats, and disrespectful conduct. The tone of Berg's communications came to reflect these attitudes. For example, Lieutenant DuPriest reported:

> These threats are not physical. They are usually threats that Mr. Berg will sue someone, file a civil rights complaint, or file criminal charges against the person being threatened if they don't take action he finds favorable. They are always presented in a tone that sends a message "Do what I want or I'll do this to you."

(Letter of disenrollment, February 10, 1992, p. 4).

Lieutenant DuPriest also reported that: (1) Berg was rude, sarcastic and disrespectful to him; (2) Berg made a number of baseless allegations against the Coast Guard and members of the Auxiliary; and (3) Berg threatened to continue the offending behavior despite warnings to desist. The record fully supports those conclusions and it also shows that, principally as the result of Berg's conduct, morale in his Flotilla continued to decline and members resigned from the Auxiliary.

Captain Melvin, who concurred in Lieutenant DuPriest's recommendation to disenroll Berg for cause, made the following significant observations:

> Mr. Berg had some valid complaints initially that were addressed. It was only when Mr. Berg refused to drop his vendetta against other members and get on with business that he became a burden. At this stage, he refused to let go and became a burden on my staff that I find hard to express. Maybe a good way is to say that in the 3½ years I have been [Commander, Fifth Coast Guard District], Mr. Berg has created more work, consumed more staff time, negatively impacted psychologically on my staff than all the other individual problems COMBINED.

(Memorandum from R.A. Melvin, III to Chief of Staff, March 5, 1992). The administrative record fully supports these comments made by Captain Melvin.

Indeed, a review of the administrative record makes it clear that the Coast Guard had ample evidence to support its findings that Berg had become an administrative burden and that Berg had acted in a manner prejudicial to the good order of the Auxiliary. Those findings warrant the Coast Guard's judgment that there was cause to disenroll Berg under the applicable regulations. Accordingly, the court declines to grant the declaratory and injunctive relief requested by Berg, declines to overturn the decision to disenroll Berg, and hereby dismisses Berg's complaint herein with prejudice.

It is so ORDERED.